1   LESLIE SCHWAEBE AKINS (SBN 138678)
    LESLIE SCHWAEBE AKINS, A Law Corporation
2   7157 Argonauta Way
    Carlsbad, California 92009
3   Telephone:  (760) 931-2920
    Facsimile:   (760) 603-0547
4   Email: lsa@stockmarketlaw.com

5   Attorneys for Plaintiffs

6                  UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
7

8   CARDINAL INVESTMENTS ONE,          NO.
    LLC, a Georgia limited liability
9   company, CARDINAL INVESTMENTS      COMPLAINT FOR:
    TWO, LLC, a Georgia limited liability
10  company, WENDY J. JONES, an        1.  Violation of California Franchise
    individual and LYNN GANGAMELLA,        Investment Law, California
11  an individual,                         Corporations Code § 31200;
                                       2.  Violation of California Franchise
12          Plaintiffs,                    Investment Law, California
                                           Corporations Code §31201;
13      v.                             3.  Violation of Robinson-Patman Act, 15
                                           U.S.C. §13;
14  DETAIL GARAGE, LLC, a California   4.  Violation of Sherman Antitrust Act, 15
    limited liability company, SMART, LLC,     U.S.C. § 1
15  a California limited liability company, 5.  Violation of Sherman Antitrust Act, 15
    formerly doing business as SMART,      U.S.C. § 1;
16  INC., a California corporation, AUTO 6.  Violation of Sherman Antitrust Act, 15
    DETAILING SUPPLIES, LLC, a             U.S.C. § 2;
17  California limited liability company, 7.  Violation of California Unfair Practices
    formerly doing business as AUTO        Act, Bus. & Prof. Code § 17045;
18  DETAILING SUPPLIES, INC., a        8.  Violation of California Cartwright Act,
    California corporation,  CG GROUP      Bus. & Prof. Code § 16720;
19  HOLDINGS, LLC, a Delaware limited  9.  Violation of California Unfair Practices
    liability company, DAVID KNOTEK, an    Act, Bus. & Prof. Code §17200;
20  individual, D. PAUL BOWER          10. Violation of California Unfair Trade
    SCHNEIDER, an individual, and CHAD     Practices Act, Bus. & Prof. Code §
21  ZANI, an individual,                   17200 and CCR 310.114.1;
                                       11. Violation of California Unfair Practices
22          Defendants,                    Act, Bus & Prof Code 17200 and Fin.
                                           Code 22100;
23                                     12. Breach of the Implied Covenant of Good
                                           Faith and Fair Dealing;
24                                     13. Negligent Interference with Prospective
                                           Economic Advantage;
25                                     14. Intentional Interference with Contractual
                                           Relations;
                                       15. Declaratory Relief – Detail Garage;
                                       16. Declaratory Relief – Detail Garage and
                                           Smart; and

                                    1

17. Declaratory Relief.

DEMAND FOR JURY TRIAL

Plaintiffs Cardinal Investments One, LLC (d/b/a Detail Garage Mesa), Cardinal Investments Two, LLC (d/b/a Detail Garage Avondale, and Detail Garage North Phoenix), Lynn Gangemella, and Wendy Jones ("Plaintiffs"), individually and on behalf of all other similarly situated, allege as follows:

## I.     JURISDICTION

1.     This Court has diversity jurisdiction under 28 U.S.C. §1332, because the amount in controversy exceeds $75,000 and the matter is between citizens of different states.

2.     This Court has subject matter jurisdiction over the Plaintiffs' claims brought under federal antitrust laws pursuant to 28 U.S.C. § 1331. This Court may also exercise supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

3.     The alleged unlawful acts and violations described below have been and are, in part, conceived, carried out, and made effective within the Central District of California, and many of the unlawful acts have been performed by defendants in this district (and division).  The interstate trade and commerce

2

described in this complaint are carried out in part within this district (and division).

4.    The Defendants, and each of them, transact business in this district (and division).

5.    This Court has personal jurisdiction over Defendants pursuant to California Business & Professions Code § 17522 which states, "Whenever it appears to the court before which any proceedings under this chapter are pending that the ends of justice require that other parties shall be brought before the court, the court may cause them to be made parties defendant and summoned, whether or not they reside in the county where such action is pending.

## II.    SUMMARY OF ACTION

6.    Plaintiffs and Class members are Detail Garage franchisees who have purchased and operate Detail Garage franchise stores that sell high-end automotive detailing products, accessories, tools and instructional services manufactured, distributed, and/or sold by franchisor's affiliate and sole supplier, Smart, LLC. Plaintiffs file this lawsuit against franchisor Detail Garage, LLC, supplier Defendants Smart, LLC and their affiliates Advanced Auto Detailing, LLC, Auto Detailing Supplies, LLC, and CG Group Holdings, LLC, and each of their principals and/or officers David Knotek, Paul Schneider, and Chad Zani for

3

declaratory relief, rescission of their Detail Garage store franchises, and for their damages arising from, or incurred in connection with their purchase and operation of their Detail Garage stores.

7.     California's Franchise Investment Law, California Corporations Code Section 31000, et seq. ("CFIL"), was enacted to protect franchise investors: i.e. those who pay for the right to enter into a business.  "It is the intent of this law to . . . prohibit the sale of franchises where the sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to protect the franchisor and franchisee by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship." California Corporations Code §31001.

8.     Federal and California law make it unlawful for a person to engage in anticompetitive business practices, which intends to or does restrain trade, fix prices or discriminate among competitors or customers.

9.     Defendants Knotek and Schneider own, operate and control the entity Defendants Smart, Detail Garage, ADS and AAD.  Since about 2003, Smart has manufactured CHEMICAL GUYS® and SMART WAX® brands of auto detailing and car care products, and doing business under these trade names, advertises, distributes and sells CHEMICAL GUYS®, SMART WAX®, TORQ®, and

BRAND X® brands of car detailing products, accessories and training services (collectively, the "Smart Products").

10.     In 2015, Defendants created Detail Garage, registered the Detail Garage franchise offering, and began advertising and selling Detail Garage franchises.  Plaintiffs assert that Detail Garage and its franchise program are not legitimate, that Detail Garage is a sham, instrumentality and the alter ego of Smart, which sought to augment its customer base through a nationwide network of destination retail stores which functioned as an outlet for Smart's CHEMICAL GUYS®, SMART WAX®, TORQ®, and BRAND X® brands of car detailing products (the "Smart Products").  By franchising the Detail Garage store concept, Smart was able to finance its corporate expansion through franchise sales, generating cash and additional product demand from captive franchisees, while transferring the risk and financial burden of the new retail concept onto the franchisees.

11.     Plaintiffs contend that Defendants filed documents containing false or misleading information and failed to comply with the disclosure requirements imposed by the CFIL and federal franchise law.  Plaintiffs further contend that Defendants Knotek, Schneider and Zani misrepresented or concealed material facts in their advertisements, offers and sales of Detail Garage franchises, and that their

consent to purchase Detail Garage franchises, and execute the franchise documents and loan agreements were induced by fraud.

12.    Plaintiffs contend that Defendants, both verbally and in writings, concealed or misrepresented facts material to the offering including but not limited to: 1) the true costs of opening and operating a Detail Garage store (which was higher), 2) that Detail Garage determined pricing and quantities of products (which is done by Smart); 3) that franchisees received "best" pricing (they do not); 4) that Detail Garage controls the approval of franchisee requests to use alternate suppliers and products (Smart controls), 5) that shortages due to unavailable products were less than 5% (shortages far exceed 5%), 6) Detail Garage developed the franchising system, its training programs, and support available to the franchisees (minimal to non-existent), and 7) the Detail Garage was a proven concept (no).

13.    Plaintiffs allege that, in reality, Smart and its principals control, manage and operate Detail Garage for their financial benefit.  Smart's principals formed and minimally funded Detail Garage and its personnel controlled the day to day activities of Detail Garage, communicate with the franchisees, collect the franchisees' payments, and use Detail Garage's National Marketing Funds to market and promote Smart's products.  In short, Smart was the true franchisor of Detail Garage franchise program, and fraudulently induced Plaintiffs and Class

members to purchase Detail Garage franchises in order to increase demand and the customer base for Smart's Products.

14.    Plaintiffs further allege that the Detail Garage franchise program is part of Defendants' illicit scheme to induce third party investment through franchising in order to cross-subsidize Smart's eCommerce and discount sales operations, increase Smart Product customer base, and supply the newly created demand from Detail Garage franchisees whose stores showcase and sell Smart's Chemical Guys and related brands of automotive products, accessories and instructional services (the "Essential Goods"), all with the eventual goal of eliminating the franchisees from the system.  To accomplish this illegal scheme, Defendants first misrepresents the Detail Garage franchise opportunity to potential investors of limited means, many of whom are lured by the purportedly low costs, high margins and financing offered by Smart (which takes a security interest in all of its assets).

15.    After purchasing the franchise, the franchisees come to discover that their costs of goods are actually higher than represented.  Plaintiffs allege that the prices they are charged for the Essential Goods are not the lowest, as represented to them in the selling process.  Plaintiffs also allege that franchisees face undisclosed competition from Smart, both direct through its eCommerce platforms,

and through their affiliate Company Detail Garage stores and through the non-franchisee distributers and retailers of Smart Products.  Moreover, the franchisees soon become the victims of Defendants' various anticompetitive practices including but not limited to, minimum price controls, price discrimination, monopolization, inventory manipulation, all aimed at restraining competition and increasing Smart's realized profits.  Smart sells the same Smart products to other preferred customers at lower prices and does not follow nor enforce its minimum authorized pricing ("MAP") policy against its non-franchisee sellers.  As a result, Plaintiffs and the Class member franchisees struggle to make customer sales while their efforts are undermined by Smart's and third-party below MAP pricing sales.

16.    Through their ChemicalGuys and Smart Wax websites, Defendants regularly provide discounts of 20% or more to new customers, and specials featuring deeply discounted products a few days each week.  However, in the last year, Smart has increased the frequency and depth of discounts advertised for Smart Products, frequently offering discounts of 40% to 50% for the purpose of driving retail customers to Smart's eCommerce platform.  Smart has acknowledged to Detail Garage franchisees that this practice harms the franchisee.  Smart knows that the franchisees cannot survive in this environment, and that they are effectively stealing the customers developed and earned by the franchisees from their additional attention and service.

17.     Defendants deploy unlawful, unfair, and anticompetitive business practices that harm the financial performance of franchise stores, restrain trade and suppress competition in the relevant market, as well as in downstream markets. Defendants' actions ultimately cause Plaintiffs and other Class members to lose sales, customers and profits, rendering them unable to keep up with or meet their obligations.  And after the franchisee can no longer bear the ruinous losses caused by Defendants' exploitation, franchisees face threat of legal action and/or termination of their business.

18.     The Agreements, their fraudulent and unlawful inducement, and Defendants' scheme to restrain the franchisees' trade, have harmed competition in the relevant product aftermarket and caused prices for the franchisees' retail customers of Smart Products to be higher than would otherwise have been. Defendants benefit from the franchisees' failure by reselling the franchise as an established store at a profit, or retaining the failed franchisees' store, inventory and assets, at a greatly reduced cost, completing its strategy.

19.     Defendants' actions and the Agreements they used to carry out their unlawful acts were specifically intended to protect Smart from price competition, inter-brand competition, intra-brand competition and unfairly restrain trade against

Detail Garage franchisees. Absent Defendants' illegal, fraudulent, unfair and anti-competitive conduct, Plaintiff and other Class members would be able to achieve a higher level of competition in the marketplace.

20.    Plaintiffs now bring this action alleging violations of: (a) California Franchise Investment Act, Corporations Code §§ 31200, 31201 and 31202, (b) the Robinson-Patman Act, 15 U.S.C. §13(a); (c) the Sherman Act 15 U.S.C. §§ 1-2; (d) the California Unfair Competition and Unfair Trade Practices Acts, California Business & Professions Code §§ 16720, 17045, 17200, and 17500, and (e) claims of common law fraud, breach of the implied covenant of good faith and fair dealing, business tort claims, and declaratory relief.  Plaintiffs seek to be made whole and therefore request the full scope of relief provided by law, including rescission and restitution, declaratory and injunctive relief, compensatory and special damages, statutory damages, including treble damages, statutory interest and attorneys' fees and costs, including expert fees.

### III.    PARTIES

21.    Plaintiff Cardinal Investments One, LLC ("CI 1") is a Georgia limited liability company formed in 2017 and registered to do business in Arizona as a foreign entity.  CI 1 was formed for the purpose of operating a Detail Garage franchise in Mesa, Arizona.

22.     Plaintiff Cardinal Investments Two, LLC ("CI 2") is a Georgia limited liability company formed in 2018 for the purpose of operating two Detail Garage franchises in, Avondale, Arizona, and Phoenix, Arizona.

23.     Plaintiff Wendy Jones ("Jones") is a resident of Arizona, and the managing member of CI 1 and CI 2.  Jones is also a guarantor of certain obligations of CI 1 and CI 2 with respect to their Detail Garage franchises.

24.     Plaintiff Lynn Gangemella ("Gangemella") is a resident of Arizona, and a member of CI 1 and CI 2.  Gangemella is also a guarantor of certain obligations of CI 1 and CI 2.  CI 1, CI 2, Jones and Gangemella are collectively referred to as the "Arizona Plaintiffs".

25.     Defendant Smart, LLC ("Smart") is a California limited liability company with its business offices located at 14108 S Western Ave, Gardena, CA 90249.  Smart, LLC is the successor to Smart, Inc. via a conversion from corporate form effective March 16, 2018.  For purposes of this complaint, Smart, LLC and Smart, Inc. are collectively referred to as "Smart".  Smart is responsible for Detail Garage billing, payment, royalty collections, staffing, internal day-to-day management decisions strategic decision and other vital responsibilities for which it receives a management fee and other undisclosed payments. At all times relevant to this complaint, Smart distributes various lines of automotive detailing products

under brands, including but not limited to the Smart Products. Smart also is engaged in the business of finance lending, and since 2017 has acted as a finance lender in approximately 30, or more, loans made to Detail Garage franchisees.

26.    Defendant Detail Garage, LLC ("Detail Garage") is a California limited liability company with its headquarters located at 14108 S Western Ave, Gardena, CA 90249. Detail Garage was formed February 9, 2015 and according to Detail Garage's Form LLC-12 filed with the state of California, its purpose of business is "Auto Detailing." In 2015 Detail Garage filed an application with the State of California to sell franchises under the name "Detail Garage" and was approved on October 27, 2015.

27.    Defendant Auto Detailing Supplies, LLC ("ADS") is a California limited liability company with its headquarters located at 14108 S Western Ave, Gardena, CA 90249.   ADS was organized March 16, 2018 via conversion in corporate form from Auto Detailing Supplies, Inc. ("ADS, INC."), a California corporation. For purposes of this complaint, ADS, LLC and ADS, INC. are collectively referred to as "ADS".   Plaintiffs are informed and allege that at all times relevant to this complaint, ADS sells Smart Product directly to end-users through online eCommerce channels.

28.   Defendant Advanced Auto Detailing, LLC ("AAD") is a California limited liability company with its headquarters located at 14108 S Western Ave, Gardena, CA 90249. AAD was organized March 16, 2018 via conversion in corporate form from Advanced Auto Detailing, Inc. ("AAD, Inc."), a California corporation. For purposes of this complain AAD, LLC and AAD, Inc. are collective referred to as "AAD". Plaintiff are informed and allege that all times relevant to this complaint, AAD is licensed to do business and is doing business in California and elsewhere in retail sales selling Smart Products.

29.   Defendant CG Group Holdings, LLC ("CG Holdings") is a Delaware limited liability company formed March 9, 2018 and is doing business in California.  Plaintiffs allege that CG Holdings headquarters is located at 14108 S Western Ave, Gardena, CA 90249. On or about March 16, 2018, CG Holdings received defendants Knotek's and Schneider's member interests in Smart, Detail Garage, ADS and AAD.   Effective on or about March 16, 2018,  CG Holdings became the manager and sole member of Detail Garage, Smart, ADS and AAD.

30.   Defendant David  A. Knotek ("Knotek"  or  "David  Knotek") is  a California  resident  and at  all times relevant  to  this  action was  or  is an employee, officer, director, manager and control person of Smart, Detail

Garage, ADS, AAD, CG Holdings and other relevant non-party entities.  At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate defendants and their affiliates, including the acts and practices set forth in this complaint.

31.     Defendant Dan Paul Bower Schneider ("Schneider" or "Paul Schneider") is a California resident and at all times relevant to this action was a founder, employee, officer, director, manager and control person of Smart, Detail Garage, ADS, AAD, CG Holdings and other relevant non-party entities.  At all times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the corporate defendants and their affiliates, including the acts and practices set forth in this complaint.

32.     Defendant Chad Zani ("Zani") is a citizen of Australia with permanent residency in the United States of America residing in California, within this judicial district.  At all times relevant to this action was or is an officer, manager, or employee of Smart, and/or Detail Garage, and their affiliate, Envi, LLC.  At all times material to this complaint, acting alone or in concert with others, he has

formulated, directed, controlled, or participated in the acts and practices of the corporate defendant, including the acts and practices set forth in this complaint.

## IV.   **ALTER EGO**

33.    Plaintiffs allege that at all times relevant to this complaint, Defendants Knotek and Schneider, individually and in concert, directly or indirectly own, control, and direct all activities of Defendants Smart, Detail Garage, ADS, AAD, and CG Holdings; as well as other relevant non-party entities or businesses, in which they own a legal, equitable or constructive interest and which they directly or indirectly controlling interest, including but not limited to, CG Holdings Management, LLC, Smart International, LLC, DG Hawaii, LLC, Detail Garage Santa Ana, LLC, Detail Garage San Diego, LLC d/b/a Detail Garage Chula Vista, Detail Garage Escondido, LLC, Detail Garage La Habra (collectively referred to as "Smart Organization").

34.    Plaintiffs allege that all times relevant to this complaint, Defendants Knotek and Schneider possessed a common controlling ownership across all Defendant entities and all relevant non-party entities, which collectively function as alter-egos of each other. This is illustrated in the following table:

| ENTITY or d/b/a | CONTROLLING OWNERSHIP |
|---|---|
| Smart, Inc/Smart, LLC | David Knotek & Paul Schneider |
| Detail Garage, LLC | David Knotek & Paul Schneider |
| CG Group Holdings, LLC | David Knotek & Paul Schneider |
| CG Group Holdings Management, Inc. | David Knotek & Paul Schneider |
| Auto Detailing Supplies, Inc. | David Knotek & Paul Schneider |
| Advanced Auto Detailing, Inc. | David Knotek & Paul Schneider |
| Smart International, Inc. | David Knotek & Paul Schneider |
| www.ChemicalGuys.com | David Knotek & Paul Schneider |
| www.SmartWax.com | David Knotek & Paul Schneider |
| Detail Garage San Diego, LLC | David Knotek & Paul Schneider through Advanced Auto Detailing |
| Detail Garage-Santa Ana, LLC | David Knotek & Paul Schneider through Auto Detailing Supplies, Inc. |
| Detail Garage La Habra | David Knotek & Paul Schneider through Auto Detailing Supplies, Inc. |
| Detail Garage Escondido, LLC | David Knotek & Paul Schneider through Auto Detailing Supplies, Inc. and Advanced Auto Detailing. |
| Detail Garage Hawaii, LLC | David Knotek & Paul Schneider through Advanced Auto Detailing, Inc. |

35. Defendants Smart, Detail Garage, ADS and AAD and CG Group, all share the same corporate headquarters located at 14108 S Western Ave, Gardena, CA 90249 ("Headquarters"). Related non-party entities and businesses CG Holdings Management, Inc., Smart International, Inc. also operate out of the Headquarters.

36.     A significant number of employees, if not all, work interchangeably between Defendant companies and the relevant non-party entities and businesses that are exclusively owned and controlled by Knotek and Schneider. These entities share office spaces, labor, bookkeeping, media and public relation personnel, day-to-day management teams and more.

37.     At all times relevant to this complaint, Defendant Detail Garage was nothing more than an instrumentality and a tool of Smart, was formed, controlled and managed by and for the benefit of Smart, and is the alter ego of Smart as demonstrated by:

a.      Detail Garage and Smart share common ownership (Knotek and Schneider until 2018, and now CG Holdings), management, office space and personnel;

b.      Smart manages Detail Garage;

c.      Smart advances to or pays for Detail Garage's expenses;

d.      Smart sold and sells Detail Garage franchises;

e.      Detail Garages' assets were used to secure loans and credit facilities issued by Bank of America;

17

f.     Smart receives and deposits Detail Garage's royalty fees and national marketing fees paid by franchisees, and were created to support, distribute and sell Smart's various lines of automotive car care and detailing products and services, and controls Detail Garage's finances;

g.     Smart uses Detail Garage's National Marketing Fund to promote and market Smart's Chemical Guys products, promotions, website;

h.     Detail Garage was and remains inadequately capitalized.

38.     In addition to possessing a common controlling ownership between all Defendant entities, Knotek and Schneider retain executive management roles across all Defendant entities, as illustrated in the following table:

| Defendant Entity | Defendant David Knotek | Defendant Paul Schneider |
|---|---|---|
| Smart, Inc./Smart, LLC **(Exclusive Supplier)** | CEO | CFO |
| Advanced Auto Detailing, Inc. | CFO | CEO |
| Auto Detailing Supplies, Inc. | CEO | CEO |
| Detail Garage, LLC **(Franchisor)** | General Manager - Member | Vice President Sales - Member |

39.     The web of entities, as they exist and operate, ensures that Knotek and Schneider retain exclusive decision-making power to afford Knotek and Schneider complete control over business activities and processes, including but not limited to, product pricing, output, distribution, strategy, financial decisions, and most importantly, their personal profits.

18

## V.   **INTERSTATE COMMERCE**

40.    The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

41.    During the time period covered by this Complaint, Defendants sold and distributed Smart Products and Essential Products throughout the United States.

42.    Defendants have sold and shipped substantial quantities of Smart Products and Essential Goods in a continuous uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced Smart Products and the Essential Goods.

## VI.   **RELEVANT MARKET**

### A. Geographic Market

43.    For those claims which proof of market monopoly power is required (i.e. those for this the rule of "per se" illegality does not apply), the relevant geographic market and area of effective competition is the United States.

### B. Product Markets

44.    The primary relevant market in this action, in which Defendants have unreasonably restrained competition and engaged in attempted monopolization and

monopolization is the aftermarket for Essential Goods for customers with Detail Garage contracts.

**C. Descriptions of the Product Market**

45.     Detail Garage franchisees seeking to purchase and sell Essential Goods, except for anticompetitive restraints alleged herein, would usually, under the circumstances pled herein, be involved in the product market for inter-brand (i.e. non-Smart Products) Essential Goods. Plaintiffs and other Class members, but for the anticompetitive restraints alleged herein, would otherwise be allowed to seek out inter-brand non-Smart Essential Goods.

46.     Through the use of unfair business practices and the Agreements, Defendants have restrained substantial trade both for the franchisees' purchase and sale of the Essential Goods, and have built barriers to and exclusions from entry into this market for inter-brand Essential Goods that could be bought and sold by customers with Detail Garage contracts. There is a lack of reasonable interchangeability and cross-elasticity in the product market for Essential Goods, between that supplied by Smart, on the one hand, and that supplied by competitors of Smart, on the other. Smart is able to extract significant supra-competitive profits for the Essential Goods it supplies in the relevant market and to achieve substantial

price discrimination for such Essential Goods between Plaintiffs (and Class members) and other resellers of Smart Products.

47.     By virtue of power to control supply chain, prices, output and exclude competition in the relevant market, Smart at all times, possess complete monopoly power in the output, supply and pricing of Smart products into, and exclusion of competitor products within, the relevant market.

## VII.   FACTS SPECIFIC TO THIS COMPLAINT

### A. Background

48.     Smart is the manufacturer, distributer, and/or supplier of Smart's CHEMICAL GUYS ®, SMARTWAX ®, and TORQ ® branded products.  Smart has been engaged in this business since around 2003 and has traditionally distributed Smart Products to resellers who in turn sell to end-users. Historically, many of Smart's customers were independent automotive detailing businesses that stock Smart Products and other branded products in their inventory for their respective customers and uses.

49.     In or around 2008, Smart began selling Smart Products directly to end-users at Defendants' first retail store owned by affiliate AAD and through one or more self-owned and operated eCommerce websites including but not limited to www.ChemicalGuys.com and www.SmartWax.com.

**B. The Detail Garage Franchise**

50.    In 2015, Smart's principals David Knotek and Paul Schneider formed Detail Garage, LLC, capitalized Detail Garage with $70,000 orchestrated, funded and began the Detail Garage franchise program using Smart's office facilities, personnel and resources.  Around the same relevant time, Defendants opened two retail Detail Garage stores which they owned through affiliates AAD and others (the "Company Stores"), which served as the purported prototype for the Detail Garage store franchise.

51.    In October 2015, Detail Garage filed its Uniform Franchise Registration Application with the California Department of Corporations, Office of Business Oversight for the initial registration of Detail Garage's offer and sale of franchise, along with its Franchise Disclosure Document ("FDD"), Seller's Agent Disclosure Form (reflecting that Smart's CEO and CFO, Defendants Knotek and Schneider, would be selling franchises), Statement of Expenses, Letter for Internet Advertising Exemption, Franchisor's Costs and Source of Funds, and Financial Statements (showing initial capitalization of $70,000) (collectively, the "Franchise Documents").  The October 2015 FDD contains the 23 Items required to be disclosed under the CFIL and Federal Trade Commission Rule 436.

52. The initial 2015 Detail Garage FDD reflected that it was selling franchises which allowed franchisees to open and operate Detail Garage stores that served as an outlet for Smart's CHEMICAL GUYS, SMART WAX, TORQ brands of high-end car care products. The specific representations contained in Detail Garage's initial 2015 FDD material to this complaint include reflected:

- the total estimated investment necessary to begin operations of a Detail Garage franchise store was $170,075 - $312,400 (later attempted reduction to $136,575 - $244,900);

- Detail Garage was a proven concept, with developed franchise system and training for the franchisees;

- Detail Garage assisted with site selection for the stores;

- Smart was the sole supplier of Essential Goods and franchisees were required to purchase all Essential Goods from Smart;

- Detail Garage set the initial quantities and prices for the Essential Goods purchased by the franchisees;

- Detail Garage set the prices that the franchisees could charge their customers for the goods and services purchased by the franchisees;

- Detail Garage approved the franchisees' requests to use alternate suppliers or to sell alternate products in their stores;

23

- Unavailability of Essential Products due to shortage would be less than 5%;

- The Company stores were prototypes for the Detail Garage franchise stores;

- Detail Garage had the discretion to approve alternate products and alternate suppliers;

- Detail Garage created the franchise system, policies and procedures identified at Exhibit E (Table of Contents of Manuals used by and for Detail Garage)[1];

- Detail Garage franchisees may face competition from Detail Garage (no disclosure regarding competition from Smart or its affiliates);

53.    Concurrent with Detail Garage's franchise filing, in October 2015, Smart also adopted a Retail Price Maintenance ("RPM")[2] policy for all Smart Products that established a minimum and maximum price structure that it required distributers and resellers to follow – a policy Smart itself does not follow.  The Detail Garage FDD does not reflect Smart's MAP policy.

---

[1] The Table of Contents attached to the 2015 FDD belies Detail Garage's claim that it developed the franchise system and manuals.  Specifically, the Operations Manual Table of Contents reflect that it is for Protein House.  Additionally, each of the attached manuals' Tables of Contents reflect that they concern a restaurant franchise business, and not a destination retail auto products supply business.
[2] Smart refers to its policy as a "MAP (Minimum Advertised Price) Policy"

24

54.     In February 2016, Defendants renewed Detail Garage's application for registration of franchise offering, with the Franchise Documents remaining virtually the same, save for certain changes reflected in the franchise offering documents, as reflected in the 2016 FDD, including but not limited to:

- Defendants reduced the amount of investment necessary to begin operations to $92,575 - $189,900 by reducing the franchise fee (to $15,000 - $25,000 from $35,000), reducing real estate costs (both square footage cost and from 3 to 2 months), reducing initial inventory to $30,000 - $50,000 (from $60,000 - $80,000) to cover 3 months of operation;

- Detail Garage through Smart offered a three-year loan financing the initial inventory order placed by the franchisee.

55.     Detail Garage purportedly sold one franchise in 2016.

***Smart Solicits Plaintiffs to Purchase Detail Garage Franchise***

56.     On November 22, 2016, Smart employee Dee Maes sent an email to Plaintiff Lynn Gangemella, advertising the Detail Garage franchise opportunity:

SmartWax (DM) <dee@smartwax.com> Tue, Nov 22, 2016 at 3:13 PM To: lynng1367@gmail.com
      Hello Lynn,
      We're excited to hear that you are interested in joining our team. Detail Garage is more than just selling Chemical Guys/SmartWax products, we promote the lifestyle that is fueled by our passion. We are the world's

largest YouTube forum that promotes detailing education for the brand that generates a buzz in the industry. Our exciting brands that has been rocking the detailing/car enthusiast world for some time now and will continue to grow. Hopefully you will get a taste our success.

https://www.youtube.com/user/chemicGuys

Why Detail Garage franchise?
   - Financing now available
   - Low franchise fee
   - Proven success in the industry
   - Low start up cost about $100,000 to start out. Other franchise out there are 400K+
   - Low investment, high returns

   - Full support and training

   - Part of a worldwide movement
**NOTE: Car care is a 1.49 billion dollar market in the United States alone and 73% of retail sales are made in physical locations and 27% are online.** (Source: 2015 SEMA Mrrket Report) (sic) . . . .

Hope to hear from you soon.
Best regards,
Dee M.
Chemical Guys - more products less price
SmartWax - evolution in car care
14108 S. Western Ave
Gardena, CA 90249
800-295-8070 ext.223
www.ChemicalGuys.com
www.SmartWax.com

26

57.     In March 2017, Detail Garage filed its Application for Renewal of Franchise Registration, along with updated Franchise Documents.

58.     In August 2017, Defendants again approached Ms. Gangemella soliciting her interest in purchasing a Detail Garage franchise and after some discussion provided Plaintiffs Jones and Gangemella with Detail Garage's 2017 FDD issued March 7, 2017.  The 2017 FDD reflected the same necessary initial investment of between $92,575 - $189,900 as reflected in the 2016 FDD.  Neither the 2016 nor 2017 FDD made reference to the higher initial costs reflected in Detail Garage's 2015 FDD.

59.     The 2017 FDD provided the 23 Items of disclosure, similar to that in the 2016 FDD.  In particular, the FDD still reflected that Detail Garage allowed the franchisees to sell additional products purchased from alternative suppliers, subject to Detail Garage's approval and payment of stated fees.

60.     Defendant Knotek, Schneider and Zani were each involved in the pre-sales communications with Plaintiffs. Based on the information provided to them, Plaintiff Cardinal Investment One, LLC ("CI 1") purchased a Detail Garage franchise which they located in Mesa, Arizona. Defendant Zani effected the sale of a Detail Garage franchise to CI 1 for a location in Mesa, Arizona; however, Zani is not identified on Detail Garage's Sales Agent's Disclosure Form filed with the

State of California in 2017 or ever.  Likewise, Detail Garage failed to register Smart's internet advertising of the Detail Garage franchise program presented on the www.ChemicalGuys.com website.

61.   CI 1's initial Essential Goods inventory order was placed by Defendants and CI 1 had little to no insight as to what was ordered, or even the price CI 1 was being charged for the Essential Goods. Plaintiffs received the prices for Essential Goods for the first time at a later date, memorialized in a master pricing sheet ("The Pricing Sheet") created by Smart. For each of the products listed on The Pricing Sheet reflects three prices: a) net or cost to franchisees, b) the "MAP" prices, and c) MSRP.  Plaintiffs were advised that they were specifically precluded from advertising the sale price the Essential Goods at any price below "MAP" pricing.

62.   Plaintiffs' initial store sells were respectable, and the community embraced the Chemical Guys products and their store.  In 2017, Detail Garage sold 7 franchises.  Further, within months of opening their first store, Defendant Zani began pressuring Plaintiffs Jones and Gangemella to expand and pick up another couple of Detail Garage franchises, stressing that they would lose their ability to acquire the wider Phoenix territory if they did not act.

63.     In June 2018, Ms. Jones received Detail Garage's updated FDD issued April 20, 2018.  Detail Garage's updated 2018 FDD reflected, at Item 19, the financial performance of Detail Stores Company and franchise stores.

64.     In July 2018, Plaintiff Cardinal Investments Two, LLC purchased two franchises in Avondale and Phoenix, Arizona.  Additionally, through Big Apple Red, LLC they entered into an Area Development Agreement with Detail Garage, giving them the right to develop a total of 10 Detail Garage stores.

65.     CI 1 opened its Detail Garage store in Mesa, Arizona in November 2017.  Plaintiff CI 2 opened the second and third Detail Garage stores in Avondale and North Phoenix, Arizona in the fall of 2018.  In 2018, Detail Garage sold 28 franchises.

**C. Defendants' Unfair, Fraudulent or Unlawful Business Practices common to Plaintiffs and the Class members**

66.     The Detail Garage franchise system designates Smart as the sole supplier of Essential Goods to the Detail Garage franchisees.  Further, at Paragraph 6.7 of the FDDs, Detail Garage represents that it sets the pricing for the Essential Goods:

"Franchisor has developed an image that is based in part on consistent and

reasonable prices for Products and services offered by the System. To

promote a consistent consumer experience, and to maximize the value of limited advertising expenditures. Franchisor may require fixed minimum or maximum prices for any Products or services offered by the System and Franchisee. Franchisee is obligated to use the pricing required by Franchisor, . . ."

67.    Detail Garage also requires its franchisees to purchase the Essential Goods in quantities set by Detail Garage, and "promptly' replenish sold out inventory.

68.    Detail Garage's disclosure documents and Franchise Agreement lead franchisees to believe that Detail Garage, and not Smart, sets the quantities and prices for the Essential Goods that they purchase and sell in their stores.  This fact is material because under California law any requirement that a franchisee purchases goods or services at more than a bona fide wholesale price or beyond a quantity reasonably necessary to begin operations or to maintain ordinary inventory supply is deemed a franchise fee and, if not disclosed, violates CFIL 31200.  See, Cal. Corp. Code §31011.

69.    Prior to Plaintiffs purchasing their franchises, during "Discovery Day" at Defendants' home office in Gardena, California, Defendants Schneider and Zani told Plaintiffs Jones and Gangemella that Detail Garage franchisees get

(pay) the "best prices" for the Essential Goods.  Recently, Plaintiffs came to discover that this was not true. The prices charged to franchisees are not "best" or lowest prices and, instead, reflects Smart's arbitrary and more generous "monopoly" mark-up owing to its exclusive supplier status.

70.    Defendants knows the true costs of the Essential Goods to Plaintiffs and other Class members are (1) higher than the costs incurred by Smart's eCommerce channels, "Company" locations and other purchasers of Smart Products that resell and compete directly with Plaintiffs and other Class members; (2) subject franchisees to an inferior competitive position; and (3) are higher than what franchisees could pay for competitive inter-brand Essential Goods. Plaintiffs were and are kept in the dark about pricing because Defendants refuse to provide the pricing information to the prospective Detail Garage franchisees until after the sale is concluded and shortly before the store opening.

71.    All Detail Garage's FDDs represent that two Company stores were the prototypes for the franchise stores, the fact is that Defendants treat the Detail Garage franchise stores differently than the Company Stores.  Defendants allow the Company stores to advertise and sell Smart Products through their store website.  Plaintiffs are informed that Defendants has provided the Company stores with additional products to bundle or give away free with purchase.  Further,

Plaintiffs are informed and allege that Smart provides more generous payment terms to the Company stores.  Plaintiffs are also informed that Detail Garage includes the internet sales made through Company Detail Garage store websites in the financial performance section of the FDDs at Item 19.

72.   Plaintiffs are also informed that, Detail Garage provides to Smart, without their permission, customer data extracted from the franchisees' Point of Sale systems, which data Defendants then use for their separate eCommerce business, including email solicitations for discounts on Smart Products purchased through their websites.

73.   Defendants use the Detail Garage franchisees to be full-service providers of information and instruction regarding the Smart Products.  This arrangement enables Smart, directly and through its third-party distributers and resellers, to sell Smart Products to the public at prices substantially less than what Detail Garage franchisees can sell them for, and often at below cost (i.e. predatory pricing). This system creates a "price squeeze" or "margin squeeze" that Detail Garage franchisees cannot compete with, which allows Smart to "free-ride" – an unfair practice by which one retailer (Smart) takes advantage of another retailer's pre-sale service or promotional efforts (Detail Garage), then offers customers the same Essential Goods at a predatory price.  By "free-riding," Smart substantially

benefits from the investment, time and full-service experience Detail Garage franchisees are required to provide to end-users, many of whom later turn to Smart's eCommerce channels to purchase the exact products, but at a lower price.

74.    Smart personnel have admitted that products sold through Smart's eCommerce channels are intentionally "sold at a loss or mega cheap to stay competitive" in order to "hook customers," and that Smart deploys "loss leaders" on its eCommerce platforms to drive traffic to its eCommerce channels.  At the time Defendants were advertising, soliciting and selling Detail Garage franchises, they knew that Smart's extensive use of eCommerce channels and alternative third party distribution channels, created price competition for Smart products, and that selling the Essential Goods to franchisees at higher costs, or imposing pricing restrictions on franchisees that were not imposed or enforced against non-franchisees, would pose a substantial threat to sales and profits of the Detail Garage franchisees stores and their long term success.

75.    Defendants knowingly create and carry out the disparate pricing strategy against the franchisees which has and continues to harm Plaintiffs and the Class member franchisees.  Defendants have further chosen to continue their discriminatory actions, which are intended to or will surely result in the franchisees' default and termination of their franchise.  Defendants ignore

Plaintiffs and other Class members complaints and objections to their unfair practices. Defendants respond by ostracizing, bullying, and retaliating against the franchisee and their stores.

76. By creating a shell-franchise operation, rather than expand Smart products through corporate development, Defendant Knotek and Schneider have shielded Smart from the financial disclosures to regulators and franchisees. Defendants and their franchise documents led Plaintiffs and other Class members into believing that as franchisees they would be able to purchase the required Essential Goods at highly comparative prices and be able to aggressively compete in the marketplace. In reality, Smart and its principals Knotek and Schneider created a captive audience of unwitting franchisees who are forced to bear the burden of the Detail Garage stores but are deprived by Smart's monopoly, of the benefits of being able to sell their goods at competitive prices for reasonable profits. Smart's anticompetitive scheme immunizes Smart from competition and allows Smart to absorb the available profits, control pricing and output while cementing a considerable revenue stream that cross-subsidizes Defendants' alternative business activities.

77.    In addition to the pricing issues discussed above, Defendants have also selectively deprived the franchisees' stores of Essential Products, leaving their stores without the high demand and profitable products to sell to their customers. Specifically, in or about March of 2019, Plaintiffs and Class members began to suffer from substantial "out of stock" issues with Essential Good orders placed with Smart. At times, Plaintiffs experienced 40%, 50% and even 60% "out of stock" on Essential Goods orders it had placed with Smart; other franchisees suffered similar shortages. This caused Plaintiffs' and many other Class members' in-store inventory to be depleted, leaving the franchisees with little or nothing to sell.

78.    During this same timeframe, Smart and its affiliate ADS were preferentially filling orders placed through Smart's eCommerce channels, including its Chemical Guys website and on Amazon, and preferred third party distributers and resellers like Walmart.  Plaintiffs are aware of other franchisees whose orders went unfilled due to "out of stock" products, resorted to purchasing the out of stock product through Smart's eCommerce channels and then reselling that product in their respective locations.

79.    To minimize Plaintiffs' damages caused by the product shortages and to avoid further catastrophe, in May 2019, and pursuant to the process set forth in

the FDD and Franchise Agreement, Plaintiffs formally requested permission from Detail Garage to purchase certain unavailable Essential Goods from alternative non-Smart sources. Just days after Plaintiffs delivered that formal request, Plaintiffs received from Defendants "Default Notices" and "Notice of Cessation" of Development rights they had purchased. Pursuant to Detail Garage's dispute resolution process, a face to face meeting was set for late August 2019 in Los Angeles.

80.    When Plaintiff Wendy Jones appeared at the meeting she was met by Smart personnel who informed Ms. Jones that, regardless of product shortages and other concerns, Smart would never allow Detail Garage franchisees to source any Essential Goods from other sources or competitors because the Detail Garage concept would remain "mono-brand" i.e., only Smart Products. Defendants' plan to monopolize the relevant aftermarkets with Smart Products has been in existence and is being implemented with full force, regardless of the damage to the Detail Garage franchisees.  At that point, Plaintiffs realized that Detail Garage was a sham and nothing more than a front for Smart Products.

***Defendants Fraudulent and Unfair Business Practices re: the Company Stores common to Plaintiffs and the Class members***

81.     Plaintiffs allege that Knotek and Schneider, through Detail Garage, have intentionally misled investors with respect to the personal financial interests they possess across the Smart Organization, including Detail Garage franchise locations that Defendants characterize as "Company" locations, but are owned, in whole or in part, by Knotek and Schneider.

82.     Plaintiffs allege that Detail Garage's "Company" locations do not contribute Royalties or Advertising Fund payments to Detail Garage, LLC, at the same rate as every franchise location is required to do, or even at all, yet benefit from the resources that franchisees accumulate for the brand.

83.     Plaintiffs allege that Knotek and Schneider ensure the "Company" locations they have a personal financial interest in receive preferential treatment as compared to franchise locations and allow these locations to also sell Smart Products through eCommerce platforms – a business model that every franchisee is strictly forbidden from engaging in, but is nevertheless a model that generates substantially more revenue and profit margin.

84.     Plaintiffs allege that Knotek and Schneider ensure the "Company" locations they have a personal financial interest in, do not incur the same costs for Essential Goods as franchisees do, and also benefit from the use corporate resources.

85.    The Smart Organization, as detailed above, enables Knotek and Schneider to ultimately control and influence consumer behavior in downstream markets for Smart Products. It enables price fixing and output control, suppression of competition and monopoly power in the relevant market.

**Fraudulent Misrepresentations**

*Facts regarding Detail Garage's misrepresentation of its Smart as true franchisor common to Plaintiffs and the Class members*

86.    When Detail Garage renews its Uniform Franchise Offering Curricular ("UFOC") each year, it also files updated financial statements, contemporaneously.

87.    Detail Garage's 2019 Financial Statements, at Note 1, states:

> "Effective March 2018 with the change in ownership, the LLC became a single-member limited liability company, a disregarded entity for federal tax purposes, which provides that the LLC passes on all income and expenses to its **parent** company to be taxed at the parent company level." (emphasis added)

88.    Item 1 of Detail Garage's Franchise Disclosure Documents for 2019 specifically states, "We have no parent." Plaintiffs have discovered that in March 2018, Defendants Knotek and Schneider transferred their member interests in Smart, Detail Garage, ADS, and AAD, to CG Holdings, which became the manager and sole members of these entities.  Hence, as of March 16, 2018, Detail

Garage had a parent company, its express representation to the contrary was false, and it failed to include CG-Holdings' financial statements in the April 2018 FDD.

89.   According to financial documents, Smart pays Detail Garage's corporate expenses and charges Detail Garage a management fee to "manage" the Detail Garage concept. In fiscal years 2018 and 2017 alone, Detail Garage claims to have incurred and owed approximately $500,000 in management fees and reimbursable expenses to Smart.

90.   Paragraph 6.8 of the FDDs states that "Franchisor will institute, maintain and administer a Marketing Fund for such advertising or public relations programs as Franchisor, in its discretion, may deem necessary or appropriate to advertise and promote the Detail Garage Businesses pursuant to Section 9 1 of this Agreement."  Yet, Smart invoices and receives into its bank account by direct deposit the monies paid by Detail Garage franchisees that are owed for Royalties, and Advertising Fund fees.  Detail Garage's accounting records reflect for each franchise location that these are "undeposited funds", which are credited by journal entry to Detail Garage.

91.   Every individual that Detail Garage has identified on its Seller's Agent Disclosure Forms, as persons authorized to sell Detail Garage franchises, lists Smart as their current employer.  Defendant Zani, who sold the Detail Garage

franchises to Plaintiffs in 2017 and 2018, is never identified on any Seller Agent

Disclosure form filed by Detail Garage.

92.     In 2018, at a time when Detail Garage purportedly owed Smart

$431,470 for management fees and reimbursable expenses, Detail Garage,

distributed $475,000 to its members, Defendants Knotek and Schneider.

93.     Plaintiffs allege that all times relevant to this complaint Smart has

always operated and controlled Detail Garage for its financial benefit.   This

material misrepresentation was deliberate and intended to mislead prospects and

franchisees about the true nature of the Detail Garage franchise concept and the

Smart Organization as a whole.

***Facts regarding misrepresentations about competition from Smart common to Plaintiffs and the Class members***

94.     In Item 1 of Detail Garage's FDD's from 2015-2019, the company

identifies the Market and Competition to a prospect by stating:

> "You will face competition from local, independently owned
> and operated auto detailing supplies businesses, regional and/or
> national brands that offer auto detailing retail products, and
> even other Detail Garage Store franchisees."

The Detail Garage FDDs are silent as to competition from Smart or any of its

affiliates.  Plaintiffs allege this was intentional and intended to deceive prospects

when entering into the contracts with Detail Garage, as it did with Plaintiffs.

40

95.     Defendants Knotek and Schneider, in combination with Zani, and through Detail Garage's FDDs, materially misrepresent Knotek and Schneider's controlling ownership of ChemicalGuys.com for the purpose of concealing the alarming conflict of interest both Knotek and Schneider possess in directing Smart to unfairly compete with Detail Garage franchisees.

96.     Smart and its principal's control over Detail Garage, ADS, and AAD, as components of the Smart Organization, is so interlaced and controlled by their own demands such that the Detail Garage franchisees are robbed of unrestricted competition and their futures are compromised from the start.  Plaintiffs allege that during the pre-sale process, and even after they became franchisees, that they and other Class members were repeatedly assured by Knotek, Schneider and Zani that the Detail Garage franchisees and their stores were of "top priority," and that the alternative channels for Smart Products would be significantly scaled back, and even terminated in some cases.   Those misrepresentations could not be further from the truth. Rather, Defendants looked at the franchisees merely existing to support Smart's eCommerce channels, and have accelerated its strategies immensely, at expense of Detail Garage franchisees.

97.     Most recently, in July of 2019, Defendants hired John Mansfield ("Mansfield") to be Vice President of Direct to Consumer. Detail Garage

41

franchisees were informed that he would oversee the Detail Garage brand moving forward. However, Mansfield's LinkedIn page states that he works for "Chemical Guys" and that his responsibility is to lead both "retail and eCommerce operations." Said another way, Mansfield works for and oversees two direct competitors, simultaneously. Mansfield, through actions and statements, has repeatedly demonstrated that Smart's business objectives ultimately control strategy decisions that impact, albeit negatively, Detail Garage franchisees.

98.   No section of any version of Detail Garage's FDDs remotely indicates that Smart and Detail Garage operations would be so interlaced as they are, let alone the fact Smart would manage Detail Garage.

99.   Plaintiffs allege that Smart actively competed against Detail Garage franchisees while Detail Garage franchisees were instructed not to pursue the "online consumer."

100.  In 2016, Detail Garage sold 1 franchise, which generated approximately $229,353 in revenue to Smart . In 2017, 6 Detail Garage franchises were sold, 3 company affiliated stores were opened, and the system generated approximately $914,463 in revenue to Smart.  In 2018, 28 Detail Garage franchises were sold, 4 company affiliated stores were opened and the system generated approximately $6,175,067.72 in revenue to Smart.  Plaintiffs are informed and

allege that in 2019, more than 15 franchise stores were sold and at the end of 2019 approximately 60 locations were actively operating.

***Facts regarding oral and written misrepresentations made by Defendants in the solicitation, offer and sale of Detail Garage franchises common to Plaintiffs and the Class members***

101.   Defendants solicited, offered and sold three Detail Garage franchises to Plaintiffs and other Class members by misrepresenting, both verbally and in writing, various facts regarding the Detail Garage franchise program, financial projections of Detail Garage stores, and the Essential Products, including but not limited to:

a.   the November 22, 2016 email from Dee Maes of Smart to Plaintiff Gangemella (see, paragraph 57 hereinabove);

b.   In Detail Garage's 2016 and 2017 FDDs materially understated the amount of money required to open a new Detail Garage franchise store, including the money going to Defendants; as its 2015 FDD's reflected costs were approximately 200% of the amounts identified in 2016 and 2017;

c.   Defendants Zani and Schneider told Plaintiffs and other Class member franchisees that the Detail Garage stores will do $500,000 in the first year, $600,000 in year two, and increase so that in year 5, the franchise stores will be doing $1,000,000;

43

d.    Defendants represented that the first three "Company" stores were templates for the franchise stores, and said franchise stores would perform similar to the Company stores;

e.    The Item 19 statement in Detail Garage's 2018 FDD is materially false and misleading as it fails to disclose that the Company stores are operated differently than the franchise stores, and particularly that these Company stores engage in internet sales, have different payment terms, order fulfillment, and give away Smart products with purchases.

102.   Other than the yearly required filings, Defendants failed to amend the Detail Garage FDD despite material changes.  Defendant Smart advertised and solicited investors to purchase Detail Garage franchises through the internet, including on their ChemicalGuys.com websites, and sent email communications to Plaintiff Gangemella and others advertising the Detail Garage franchise opportunity, but never provided those internet advertisements to the California commissioner, as required.

*Facts regarding misrepresentations by Defendant Zani, as an agent of Smart selling Detail Garage franchises common to Plaintiffs and the Class members*

103.   Detail Garage filed its Initial Uniform Franchise Registration Application ("UFRA") with the State of California in or around October 27, 2015.

**Commented [TB1]:** What do you mean here? Do you just mean they have never amended mid-year, as opposed to yearly re-newels? In that case I understand.

44

Detail Garage has subsequently filed four UFRA renewals for years 2016, 2017, 2018, and 2019.

104.    When filing a UAFR, a franchisor is required to contemporaneously file Franchise Seller Disclosure forms. The following individuals are the only people who have ever been identified as persons authorized to solicit, offer, or sell franchises for Detail Garage: David Knotek, Paul Schneider, Christian Oliva, and Dee Maes.

105.    Sometime in 2017, Defendants Knotek and Schneider tasked Defendant Chad Zani ("Zani") to sell franchises for Detail Garage. Zani identified his job title as "Director of Franchising" and Detail Garage's 2018 FDD identified Zani as "National Franchising Manager."

106.    Prior to his role with Detail Garage, Defendant Zani had no experience in franchising and served as CEO of an affiliate company, Envi California, LLC, from April of 2015 through May of 2017.[3] Upon information and belief, Plaintiffs allege that Defendant Knotek also served as Vice President of Strategic Planning for Envi California, LLC, a fact not disclosed in Detail Garage's Franchise Disclosure Documents or Seller Disclosure Forms.

---

[3] Detail Garage does not list Envi California, LLC as an affiliate in its 2018 or 2019 Franchise Disclosure Document.

107.    According to Franchise Seller Disclosure forms required by law to be filed with the State of California, Defendant Zani is not an individual who has ever been authorized to solicit, offer or sell franchises for Detail Garage. Nevertheless, Defendant Zani is directly responsible for the offering and sale of more than 40 franchise licenses on behalf of Detail Garage and continues to sell franchises today. As Zani operates as an unauthorized seller of franchises in violation of California law, Zani also brokers business loans, on behalf of Smart, to Detail Garage franchise prospects and existing Detail Garage franchisees. Plaintiffs are in possession of evidence that Zani was soliciting, offering, negotiating and executing loan terms, as an agent of Smart.

108.    Plaintiffs allege that under California law, Smart is not licensed financial lender.

109.    Plaintiffs allege that when Zani began selling Detail Garage franchises, he purposely failed to properly qualify prospects seeking to purchase a Detail Garage franchise. Despite inducing financially vulnerable prospects to invest in a Detail Garage franchise, Zani also pressured distressed franchisees, who's stores were failing, to borrow money from high interest lenders and "pay day" lenders, thereby taking on additional debt, in order to continue to make more

46

Essential Goods purchases from Smart, ultimately putting them in a downward debt spiral which led to their financial demise. When confronted about his tactics, Zani has threatened and intimidated Detail Garage franchisees who voiced concerns over misrepresentations made to them.

110.    Plaintiffs allege that Zani made representations about future earning potential to prospects, to them, and several Class member franchisees, communicating statements such as:

(1)    how "high the margins" are on Smart Products and that the "profit is just ridiculous"

(2)    that locations could do over "100k a month like Gardena" if franchisees would "follow the plan."

(3)    that franchisees would get the "best pricing" for Smart Products.

***Facts regarding misrepresentations made to franchisees about start-up costs, on-going costs, store performance and support, common to Plaintiffs and the Class members.***

111.    Smart and Detail Garage, through Zani, made false and/or misleading representations and omitted material facts in communications with prospective investors regarding startup costs, financial performance, cost of goods, competition and management, in order to induce their purchases of Detail Garage franchises.

112.    Smart solicited prospects with promises of "Low franchise fee," "Proven success in the industry," "Low startup cost about $100,000 to start out," "Low investment, high returns," and "Full support and training."

113.    Plaintiffs allege that Zani told prospects pre-sale and franchisees post sale, that the stores operate at "60% margins" and stores would "do over a million, like Gardena." In item 19 of the 2018 FDD, Detail Garage claims the Detail Garage Gardena ("Gardena") location achieved a 2017 yearly sales revenue of approximately $1,594,047. Plaintiffs allege that this figure is grossly misleading and was manufactured to mislead current and potential Detail Garage franchisees as to the potential success of a Detail Garage retail location. Also, in Item 19 of the 2018 FDD Detail Garage claims that the Detail Garage Hawaii ("Hawaii") location achieved a 2017 yearly saves revenue of approximately $1,476,472. Plaintiffs allege that this figure is grossly misleading and is used to mislead prospects as to the potential of success of a Detail Garage retail location.

114.    Plaintiffs allege they were misled about the "experience" and "history" of the Detail Garage concept as the 2018 FDD states that the first Detail Garage location (the Gardena location) has been open for "10 years" (i.e. since 2008), which Plaintiffs allege is grossly misleading as the Gardena location did not exist until around 2014 and is not operated in the same way.

115.   Plaintiffs allege Defendants mispresented the "startup costs" they would incur by almost 30%, as well as the ongoing expenses associated with operating a Detail Garage by as much as 50%, in order to induce them to purchase a franchise.

116.   Plaintiffs allege they were misled as to the "full support" and "training" Defendants promised and were obligated to provide, which caused Plaintiffs, and other Class members substantial hardship in starting up and operating their businesses. Plaintiffs were not provided with construction, store layout or build-out assistance. Plaintiffs were not provided with adequate in-store store training nor were they provided any training on how to administrata a detail garage retail operation. Plaintiffs were not provided with proper training with respect to placing inventory orders nor were they properly trained on Point of Sale systems that are required to be used in the stores. Of the 40 hours of "training" Plaintiffs were required to attend, no less than 38 hours were spent teaching Plaintiffs how to detail a vehicle with Smart Products. This training was administered by "Smart Detailing University," led by Defendant Schneider.

**Failure to Comply with Legal Requirements**

117.   In addition to being Detail Garage's only approved supplier of goods and services to the franchisees, as indicated in Detail Garage's FDD, Smart

finances the franchisees' initial inventory orders with either a $5,000 (2017 FDD) or $10,000 (2018 and 2019 FDD) down payment.  Smart is not licensed by the State of California as required by California Finance Code § 22100.  Nevertheless, Plaintiffs are informed and allege that since February 2016, Smart has financed loans for more than 40 franchisees.

118.    Further, both Smart and Detail Garage have ignored lawful requirements with respect to the Franchise Agreements and associated loan documents. Neither Smart nor Detail Garage have complied with the legal formalities for creating binding agreements, by (1) having franchisees, or their principles execute blank Inventory Purchase Agreements, Promissory Notes, and Guaranty, Indemnification and Acknowledgement forms when they execute the Franchise Agreements; (2) Failed to have franchisees execute any of the franchise documents but allowed them to open and operate DG stores; (3) Failed to comply with State and Federal franchise disclosure laws or obtain Item 23 receipts from the actual franchisee. These failures to comply with the legal requirements renders the documents void and unenforceable as a matter of law.

119.    Defendants failed to satisfy Franchise Disclosure Documents requirements under State and Federal law. Further, the loan documents for the initial inventory loans are blank and do not contain principal amounts or loan payments.

**Unconscionable and Unenforceable Franchise Agreements**

120.    Based upon the misrepresentations stated throughout this Complaint, Detail Garage and Smart exploit their overwhelming bargaining power to require the franchisees to consent to arbitration agreements contained in overwhelmingly one-sided adhesive franchise agreements, guarantees, and secured promissory notes without any potential for negotiation of their terms.

121.    These misleading and deceptive franchise agreements purport, among many other things, require Plaintiffs and the franchisees to arbitrate their disputes with Detail Garage but enable Detail Garage to litigate in court its claims against the franchisees.  The Franchise Agreement further seeks to shield nonparties and party principals from liability for their actions, in violation of California and federal law.   The agreements further seek to give Smart and Detail Garage unilateral control over all significant aspects of franchisee operations, to disclaim any responsibility for the effect of Detail Garage's decisions and actions on the franchisees' viability, and to restrict the ability of franchisees to litigate in their home states, to join with other franchisees to press claims, and to enjoy their Constitutionally-guaranteed right to a jury trial.

122.    The terms of the agreements, and their "Operations Manual" (which Detail Garage uses as an extension of the franchise agreement in order to expand

upon the terms of the original agreement), are in combination so burdensome on franchisees and so one-sided in favor of Detail Garage that they can only be regarded as unconscionable and unenforceable.

**Exclusive Dealing**

123.   Smart entered and have continued to abide by an agreement by which Smart operates as the exclusive distributor of the Essential Goods sold to Plaintiffs and Class member.

124.   Although Plaintiff and Class members do not have access to the agreement between the Smart and Detail Garage, LLC, in order to become a franchisee of Detail Garage, Plaintiffs and Class members are forced to sign an agreement which memorializes that Plaintiffs and Class members are required to purchase all of their Essential Goods exclusively from Smart.

125.   Smart employees have communicated verbally and in writing that no other supplier is, or will ever be, allowed to supply Essential Goods to Plaintiffs or Class members.

126.   Since Smart manages all operational duties of Detail Garage, LLC, and Defendants Knotek and Schneider are officers of both companies, Smart employees are shared across corporate lines enabling the enforcement of the arrangement to be an easy task.

**VIII.   CLASS ALLEGATIONS**

127.   **Class Definition:** Plaintiffs bring this action individually and on behalf of a Class defined as follows:

> All persons who purchased or was a guarantor of a Detail Garage franchise between February of 2016 to the present.

128.   **Numerosity:** Joinder of all Class members is impracticable. While the size of the Class is not known with certainty, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that the Class numbers potentially over 50. Class members are geographically dispersed throughout the United States. The Class members are identifiable from information and records in Defendant' posses.

129.   **Commonality:** Questions of law and fact are common to the Class including, but not limited to:

a.      Whether Detail Garage's franchise documents and agreements are false, misleading or omit material facts necessary to make the representations made not misleading;

b.      Whether Detail Garage violated California's Franchise Investment Law;

c.      Whether Detail Garage is the alter ego of Smart;

d.      Whether Detail Garage's Franchise Disclosure Documents are materially false or misleading;

e.      Whether Smart obtained and maintained monopoly power in the relevant markets in the United States;

f.      Whether Smart obtained and or maintained monopoly power in the relevant markets through anti-competitive and unlawful activity;

g.      Whether Defendants engaged in agreements, contracts, combinations and conspiracies, which had the purpose and or effect of unreasonably restraining competition and limited members of the Class to competing and lower-priced Essential Goods;

h.      whether Defendants' unreasonably anti-competitive contract, combination and conspiracies have caused Plaintiffs and the other members of the Class to suffer antitrust injury;

i.      whether Defendants' unlawful conduct caused Plaintiffs and other Class members to pay more for Essential Good products than they otherwise would have paid;

j.      the appropriate Class-wide measure of damages; and

k.      whether Defendants' anti-competitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

130.  **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and other Class members are direct purchasers of Smart Products and were overcharged and thus injured by the same wrongful conduct of Defendants. Defendants' violation of the antitrust laws, the effects of such violations, and the relief sough are all issues or questions that are common to Plaintiffs and the other Class members.

131.  **Adequacy:** As representatives of the Class, Plaintiffs will fairly and adequately protect the interests of all Class members.

132.  **Predominance:** The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure. Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

133.  **Superiority:** Class action treatment is a superior method for faith and efficient adjudicating of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute his or her common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. A class action enables injured person or entities to obtain redress on claim that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

## VIII.  CAUSES OF ACTION

**COUNT I**
**(Against Smart, Detail Garage, Knotek, Schneider, Zani and CG Holdings)**
**Violation of California Franchise Investment Law –**
**California Code Section 31200**

134.  Plaintiffs incorporate herein by reference paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

135.  California Corporations Code §31200, provides: "It is unlawful for any person willfully to make any untrue statement of a material fact in any application, notice or report filed with the commissioner under this law, or willfully to omit to state in any such application, notice, or report any material fact which is

56

required to be stated therein, or fail to notify the commissioner of any material change as required by Section 31123."

136. Defendants Smart, Detail Garage, Knotek, Schneider and Zani violated Section 31200 by making one or more untrue statements of material fact in the applications, notices, or reports filed by or on behalf of Detail Garage with the California commissioner in 2015, and in connection with Detail Garage's renewals filed in 2016, 2017, 2018 and 2019, including but not limited to:

a.   Defendants violated 31200 in years 2015 – 2019 by filing multiple materially misleading letters regarding internet advertising, which violated the requirements of Section 31156, which section  makes it unlawful for any person to publish in this state any advertisement offering a franchise subject to the registration requirements of this law unless a true copy of the advertisement has been filed in the office of the commissioner at least three business days prior to the first publication or such shorter period as the commissioner by rule or order may allow, or unless such advertisement has been exempted by rule of the commissioner.

b.   The internet advertising letters filed by letter the affirmation of its President David Knotek which affirmed its email address, and represented that: 1) it would comply with the California Franchise Investment Law and Rules (which includes Code of Regulations 310.156.3

and 310.157), and 2) any internet advertisement would not be targeted to specific persons.

c.      Defendants' published internet advertisements offering Detail Garage franchises to the public, and including their November 22, 2016 email to Plaintiffs, do not comply with either Regulation 310.156.3 and 310.157 which provides that "Any advertisement of a franchise should disclose fairly and accurately such relevant facts concerning the franchise, the terms and conditions thereof and the material rights and liabilities created thereunder as are necessary to make the advertisement not misleading." Defendants' directed advertisement to Plaintiffs, as set forth hereinabove, was false or misleading and failed to comply with the more specific standards set forth in Regulation 310.157 regarding risk, financial performance, and required disclosures.

d.      Defendants were and are advertising the Detail Garage franchise opportunity not just through Detail Garage's website, www.DetailGarage.com, but also through Chemical Guys' website, www.chemicalguys.com.

e.      Defendants filed false and materially misleading Seller's Agent Disclosure Forms with the California commissioner in 2016, 2017 and 2018,

as they did not include disclosure of Chad Zani, who sold the Detail Garage franchises to Plaintiffs.

     f.    Detail Garage's 2017 FDD and 2018 FDD made one or more untrue statements of material fact, or omitted to state material facts which were required to be stated to make the FDD not misleading.  Specifically, the 2017 FDD and 2018 FDD materially understated the estimated initial investment necessary to begin operations of a Detail Garage franchise store or area development agreement, and understated the monies which Detail Garage or its affiliate would receive out of the initial investment.  Detail Garage's 2015 FDD reflects a significantly higher estimated initial investment necessary to begin operations of a Detail Garage franchise store or as an area franchisee of almost double.  The 2015 FDD was loosely modeled at best on Defendants' experience operating the company and affiliate owned stores;

     g.    Additionally, the 2017 FDD significantly understated the minimum opening inventory that franchisees had to purchase from Smart as $30,000.  The 2015 FDD required the franchisee to purchase a minimum opening inventory of Essential Goods from Smart of $60,000.  Defendants increased the opening inventory in the 2018 FDD. Despite the inconsistent

misrepresentations, Defendants forced a $70,000 opening inventory on Plaintiffs when they opened their first location.

       h.     The 2017 and 2018 FDD omitted the fact that affiliate Smart, the sole approved supplier of Essential Goods sold in Detail Garage franchise stores, actually controlled Detail Garage and receives management fees for managing Detail Garage.

       i.     The 2017 and 2018 FDDs misrepresented that, with respect to the Essential Goods ordered by franchisees for their Detail Garage stores, product unavailable to franchisees due to shortages would be 5% or less;

       j.     The 2017 and 2018 FDDs misrepresent Detail Garage's relationship with Smart, Knotek and Schneider.  Defendants understate the extent of their ownership interest in Smart or the other affiliates of Detail Garage;

       k.     The 2018 FDD omits the fact that in March 2018, Defendants formed CG Holdings, that ADS, AAD and Smart converted to limited liability companies, and that Schneider and Knotek transferred their interests in Detail Garage, Smart and ADS to CG Holdings effective March 16, 2018;

l.    The 2017 and 2018 did not disclose that Defendants pay commissions to their agents, affiliates or third parties for selling Detail Garage franchises and area franchises;

m.    The 2017 and 2018 do not disclose that Defendants and their affiliates who own Detail Garage franchises receive preferential treatment, and their interests are placed ahead of the franchisees' interests;

n.    The 2017 FDD misrepresents the training and support the franchisees receive from Detail Garage;

o.    The 2017 FDD fails to disclose that the computer, software and point of sale systems they require franchisees to purchase were not properly vetted by Defendants nor were operational; and

p.    The 2017 and 2018 FDD's misrepresented and/or omitted facts as to the true potential or existing conflicts of interest that existed between Defendants, their affiliates and the Detail Garage franchisees.

137.   Defendants provided to Plaintiffs and the Class members the Detail Garage FDDs with the intent that Plaintiffs and the Class members and other prospective franchisees rely upon the provided information, and the absence of the omitted facts in deciding to invest in and purchase the Detail Garage franchises and area franchise.

138.   California Corporations Code Section 31300 provides that "Any person who offers or sells a franchise in violation of Section . . . 31200 . . . shall be liable to the franchisee . . . , who may sue for damages caused thereby, and if the violation is willful, the franchisee may also sue for rescission.  Plaintiffs and the Class members relied upon the FDDs.

139.   Additionally, California Corporations Code Section 31302 provides, "Every person who directly or indirectly controls a person liable under Section 31300 or 31301, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

140.   Detail Garage's violation of Section 31200 has damaged Plaintiffs and the Class members who purchased Detail Garage franchises.  Defendants' Knotek, Schneider, and Zani, as officers, control persons, or employees that participated in the franchise transactions that violate Section 31200 are jointly and severally liable to Plaintiffs and the Class members for their damages.

141.   Further, Defendants' misrepresentations and omissions in the 2017 and 2018 FDDs were willful.  Specifically:

a.      Defendants knew that the estimated initial investment necessary for a franchisee to begin operating a Detail Garage franchise store or area agreement was significantly greater than represented in the 2017 and 2018 FDDs.

b.      Detail Garage's original cost estimate to start a franchise store started at $170,000, which they reduced to encourage the sale of franchises which didn't occur until 2016 after it reduced its initial franchise fee from $35,000 to $25,000, reduced the minimum initial opening order of Essential Goods (from $60,000 to $30,000) and offered financing through Smart with $5,000 down payment.

c.      Defendants through Smart and ADS controlled the pricing and order fulfillment of Smart's sales of car care products via the internet, through alternative sales channels, through affiliates and company stores, and through the franchisees.

d.      Detail Garage was nothing more than an alter ego of Smart, who managed, operated and controlled Detail Garage for its own financial interest, disregarded their duties and obligations to regulators, the franchisees, and the franchisees' customers, and used the Detail Garage

63

franchisees and the revenues they generated as a source of additional profits to cross-subsidize Smart's growth and expansion.

    e.    Defendants abused their power and control and engaged in anticompetitive business practices, including price fixing, price discrimination, and order fulfilment manipulations.

    f.    Defendants further knew that Detail Garage had no reasonable basis to represent that product unavailability due to shortage would be "5% or less", as, on information and belief, there had been product shortages far in excess of 5%.

142.  As a direct and proximate result of Defendants' willful violation of Corporations Code Section 31200, Plaintiffs and the Class members are entitled to rescind all Franchise Agreements and all associated documents and agreements, including the Inventory Purchase Agreements, Promissory Notes, and Personal Guarantees, and Area Development Agreement, and recover monies to compensate them for all damages, loss and harmed they have suffered with respect to, concerning or arising from the purchase of the two franchises and area development Agreement, the exact amount and extent of which will be determined at the time of trial, according to proof.

64

**COUNT II**
**(Against Smart, Detail Garage, Knotek, Schneider and Zani)**
**Violation of California Franchise Investment Law,**
**Corporations Code Section 31201**

143.   Plaintiffs incorporate herein by reference paragraphs 1 through 142 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

144.   California Corporations Code Section 31201 makes it unlawful for any person to offer or sell a franchise in this state by means of any written or oral communication not enumerated in Section 31200 which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

145.   Since 2016 and continuing through the present Defendants Smart, Detail Garage, Knotek, Schneider, and Zani have made verbal and written representations to prospective franchisees, including Plaintiffs and the Class members, which contained one or more untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to:

a.      Smart's November 22, 2016 email from Dee Maes to Lynn Gangemella representing "Low start up cost about $100,000 to start out. Other franchise out there are 400K+; -Low investment, high returns; - Full support and training. . ."

b.      the franchisees got "best pricing" i.e., were charged the lowest costs for the Essential Goods;

c.      The Company Stores were the same as the franchise stores (oral and written);

d.      Essential Goods/ Smart products are not sold below MAP pricing (oral and written), and

e.      That Detail Garage franchisees could purchase and sell in their franchise stores other brands of car care products.

146.  Defendants' oral and written representations were untrue or misleading.  Specifically:

a.      Smart's November 22, 2016 email contains false or misleading representations and is contradicted by Detail Garage's October 2015 FDD regarding "low startup costs", "low investment high return", "proven system", and "full support and training";

b.      the franchisees are not charged the lowest price for the Essential Goods.  Instead, Smart charges other preferred customers and discount retailers less;

c.      the Company stores are not the same as franchise stores, as they receive preferential payment terms, advertise and sell Smart Products on their websites, and some also perform detailing services which is prohibited for the franchisees;

d.      Smart and certain third-party distributers and resellers are selling Smart Products below MAP, and sometimes below the franchisees' costs of goods; and

e.      Defendants had no intention of allowing Detail Garage franchisees to purchase Essential Goods from non-Smart sources or to sell alternative brands of car care products other than Smart Products.

147.  Plaintiffs were ignorant of the true facts, and reasonably relied upon the oral and written representations they received from these Defendants.  Plaintiffs and Class members were fraudulently induced to purchase Detail Garage franchises and area development agreements by Defendants' untrue statements and omissions of material fact that should have been disclosed to make their representations accurate.

148.   As a direct and proximate result of Defendants' actions, misrepresentations and/or omissions of fact, they have violated Section 31201, and are liable to Plaintiffs and Class members for their damages arising from or related to Plaintiffs' franchise purchases, and said violations were substantial factors in causing Plaintiffs' and Class members' damages.

149.   Defendants' Knotek, Schneider and Zani's status as executive officers, director, control persons and/or employees that substantially assisted and participated in the sales of franchises to Plaintiffs and the Class members also render them each personally jointly and severally liable to Plaintiffs and the Class members pursuant to California Corporations Code Section 31302.

150.   As a direct and proximate result of these violations, Plaintiffs and the Class members have suffered damages, including all costs and expenses incurred in connection with their Detail Garage franchises, lost principal invested, lost profits, all in an amount to be determined at the time of trial according to proof.

151.   For the reasons set forth hereinabove, Defendants' violations of Section 31201 were willful, thereby entitling Plaintiffs and the Class members to rescind their Detail Garage Franchise Agreements, including all additional agreements arising out of or in conjunction with these agreements including all loans and personal guarantees.

152.   The conduct of defendants, and each of them, is fraudulent, malicious and oppressive, in that:

a.   Defendants' conduct was fraudulent in that they knowingly filed franchise registration documents with the State of California Department of Business Oversight that included false and untrue information, and disseminated the fraudulent FDDs to prospective franchisees in order to sell franchises, which conduct continues to this day;

b.   Defendants intended to and are wrongfully profiting at the expense of Plaintiffs and other franchisees through their receipt of franchise fees, royalty fees, national marketing fund fees, and greatly increased sales of Essential Goods to franchisees (from $0 to over $10 million in revenues by Smart from franchisees' purchases of supplied product for franchise stores);

c.   Defendants' conduct was also oppressive or malicious in that Defendants operated the Detail Garage franchisee for their own benefit, in disregard for the rights of Plaintiffs and the Class members.  Defendants placed their interests over the franchisees by undercutting the franchisees' ability to succeed by engaging in improper price fixing, and price discrimination against franchisees.  Defendants overcharged franchisees for the supplies they were required to provide and shorted them product such

that they could not compete with Defendants and their preferred distributers. Defendants selectively fulfilled their non-franchisee purchase orders and caused the franchisees to suffer product shortages that greatly exceeded 5%. Defendants attempted to poach Plaintiffs' and other franchisees' customers through direct solicitations offering discounts and other special promotions. Defendants knew or should have known that Plaintiffs and Class members would be harmed by these actions but, nevertheless did so anyway, resulting in franchisee default.

153.   As a direct and proximate result of Defendants' willful violation of Corporations Code Section 31201, Plaintiffs and the Class members are entitled to rescind all Franchise Agreements and all associated documents and agreements, including the Inventory Purchase Agreements, Promissory Notes, and Personal Guarantees, and Area Development Agreement, and recover monies to compensate them for all damages, loss and harmed they have suffered with respect to, concerning or arising from the purchase of the two franchises and area development Agreement, the exact amount and extent of which will be determined at the time of trial, according to proof.

**COUNT III**
**(Against all Defendants)**
**Violation of Robinson-Patman Act, 15 U.S.C. 13(a)**

154.   Plaintiffs incorporate herein by reference paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

155.   The Robinson Patman Act, 15 U.S.C. Section 13(a), makes it unlawful for any person engaged in commerce, in the course of such commerce, to engage in price discrimination or to sell or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.

156.   Smart and Detail Garage, acting in concert, engaged in price discrimination against Plaintiffs and Class members by first, requiring the Plaintiffs and Class members, as Detail Garage franchisees, to purchase all Essential Goods from Smart, and then second, by selling the same Smart Products to favored purchasers at both prices that are lower than the prices that Smart charged to Plaintiffs and Class members for the same products.

157.   Smart granted preferential terms that were not offered nor otherwise available to Plaintiffs or other Class members. Smart further engaged in indirect price discrimination by allowing the non-franchisee distributers, resellers and competing retailers to sell the Smart Products below Smart's MAP pricing, while

in turn, restricting Plaintiffs and Class members to selling Smart Products at or above MAP pricing.

158.  Smart's price favoritism was not justified by any cost savings it realized in conjunction with those sales.

159.  Smart also sold and continues to sell Smart Products at unreasonably low prices through the internet on Chemical Guys websites and on Chemical Guys online stores on Amazon and eBay, and to their affiliates who distributed or resold Smart Products to wholesalers or retailers, for the purpose of destroying or eliminating competition from Detail Garage franchisees.

160.  Since 2016, the number of Detail Garage franchise stores has increased, and sales of Smart Products by Detail Garage franchisees have also increased.  However, Smart implemented high frequency sales and promotions on Smart Products, and engaged in deep discounting of Smart Products of up to 50% during these promotions and sales.

161.  Smart's price discrimination and deeply discounted direct sales of Smart Products to consumers has substantially harmed competition between Plaintiffs and other Detail Garage locations on the one hand, and Smart's eCommerce channels on the other. Smart's significantly discounted prices which, over time, has grown in frequency of occurrence and depth of discount is intended

to or has the inevitable effect of luring consumers away from the franchisees and eliminating virtually all profit from sales of Smart Products.

162.   Smart's price discrimination and unreasonable discounting strategy has in turn caused economic harm to Plaintiffs and Class members' businesses as well as to their customers – the ultimate end-users who purchase Smart Products from Detail Garage franchise stores which, because of this pricing disparity, must pay (and continue to pay) higher prices, than if Smart did not discriminate in the price it charges Plaintiffs and Class members.

163.   Plaintiffs and Class members have been damaged by Smart's discrimination through loss of their customers to Smart's eCommerce channels and other favored resellers of Smart Products, because of their inability to attract and retain customers through price competition. Plaintiffs and Class members make lower profits on their existing sales and by selling lower volumes of Smart Products than they would sell in the absence of the discrimination.

164.   Smart and Detail Garage have market power in the relevant market, including the power to control prices and exclude competition.

165.   As a direct, foreseeable and proximate result of Defendants' anticompetitive conduct, Plaintiffs and the Class members have been injured in their Detail Garage franchise business.

73

166.   Because of Defendants' actions, Plaintiffs are, at least, entitled to: i) compensatory damages in an amount according to proof; ii) treble damages pursuant to 15 U.S.C. §15(a); iii) injunctive relief issued against Defendants; and iii) reasonable attorneys' fees and costs of suit under 15 U.S.C. §15(a).

**COUNT IV**
**(Against Smart, Detail Garage, Knotek, and Schneider and Zani)**
**Unreasonable Restraints of Trade**
**(Section 1 of the Sherman Act, 15 U.S.C. § 1)**

167.   Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set forth in full.

168.   Section 1 of the Sherman Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce, is declared to be illegal. 15 U.S.C. §1.

169.   Smart and Detail Garage, acting in concert, have unreasonably restrained trade and competition by (1) charging Detail Garage franchisees unreasonable and excessive prices for the Essential Goods they were required to sell through their Detail Garage stores; (2) imposed minimum approved restrictions (Smart's MAP prices) upon Detail Garage franchisees for the Essential Goods that

were not enforced against non-franchisees; (3) prohibited Detail Garage franchisees from purchasing bundled products (i.e. "kits") and selling them through their Detail Garage stores; (4) prohibited Detail Garage franchises from advertising or selling Smart Products from any location other than their franchise store location, including over the internet, and other unfair business practices imposed specifically against the franchisees.

170. Smart and Detail Garage's contracts, combinations and conspiracies and the acts related thereto, which unreasonably restrain competition in these markets also include, but are not limed to: (a) obtaining and enforcing Detail Garage contracts using the coercive, misleading, fraudulent and retaliatory techniques alleged herein this Complaint; (b) employing separate legal entities to effectuate the scheme in order to avoid disclosure requirements required by law; (c) prohibiting Plaintiffs and Class members from selling the Smart Products to customers below MAP prices; (d) discriminating against Plaintiffs and Class members in the fulfillment of their orders for products.

171. The contracts, combinations and conspiracies of Smart and Detail Garage set out in this Complaint unreasonably restrain trade and restrict the access of inter-brand Essential Goods to the market, harming Plaintiffs and Class members in the operation of their businesses.

172.   Smart and Detail Garage's actions, by unreasonably restraining trade and restricting access of Plaintiffs and other Class members to inter-brand Essential Goods in said markets, restraining competition in these markets and in downstream markets, are not justified by plausible arguments that these actions were intended to increase output, enhance efficiency of, lower prices of, or make more competitive the markets for inter-brand Essential Goods to customers with Detail Garage contracts. These actions in fact injure competition and consumers, decrease output, raise prices and decrease economic efficiency in said markets. The likelihood of anticompetitive effects from such actions outweigh the procompetitive effects, if any.

173.   The purpose of these actions was to shield Smart products from competition and restrain trade in the relevant market. The aforesaid violations of Section 1 of the Sherman Act by Smart and Detail Garage have, and will continue to have numerous effects including but not limited to (a) suppression and exclusion of potential competition of inter-brand competition of Essential Goods purchased by Plaintiffs and other Class members; (b) supra-competitive prices for Essential Goods sold by Smart; (c) higher prices to end-user consumers; (d) denial to Plaintiffs and other Class members the benefit of unrestricted competition in the

market for Essential Goods; and (e) substantially decreased profits for Plaintiffs and other Class members.

174.  The violations of Section 1 of Sherman Act by Smart and Detail Garage were and are continuing violations.

175.  Because of Defendants' actions, Plaintiffs and the Class members are, at least, entitled to: i) compensatory damages in an amount according to proof; ii) treble damages pursuant to 15 U.S.C. §15(a); iii) injunctive relief issued against Defendants; and 3) reasonable attorneys' fees and costs of suit under 15 U.S.C. §15(a).

**COUNT V**
**(Against Smart and Detail Garage)**
**Tying Arrangements**
**(Section 1 of the Sherman Act, 15 U.S.C. § 1)**

176.  Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

177.  Smart and Detail Garage, acting in concert, condition and impose on the sale of a Detail Garage franchise license (the "tying product") to Plaintiffs and Class members their mandatory purchase of Essential Goods from Smart ("tied

product") or at a minimum prohibit Plaintiffs or Class members from buying Essential Goods from a competitor of Smart.

178.   Smart and Detail Garage, as alleged herein this Complaint, have complete economic power over Detail Garage franchisees in the tying product (Detail Garage franchise license) and this power allows Smart and Detail Garage to restrain competition in the market for the tied product, or otherwise affect a substantial amount of commerce in the market for the tied product – Smart Products.   For example, Smart received ever increasing revenues from sales of Essential Goods to Detail Garage franchisees of $229,353 in 2016, and $914,463 in 2017, to $6,175,067 in 2018.

179.   The tying product and the tied product are separate and distinct from one another. Smart and Detail Garage's tying arrangement has been successful. Smart and Detail Garage have been able to force purchasers of a Detail Garage license (tying product), who are "locked-in", to buy the Essential Goods (tied product) from Smart in 100% of cases. If Smart and Detail Garage had not, and would not, unfairly and illegally enforce its anticompetitive tying arrangement, Plaintiffs and the Class members may or would purchase some of the tied purchases in the relevant market from another competitor of Smart. As a result, by imposing the tying arrangement, Smart and Detail Garage have harmed

competition in the markets for the tied product and foreclosed a substantial volume of commerce in the market for the tied product.

180.   Smart and Detail Garage's tying arrangement has caused injury to Plaintiffs and Class members as well as other sellers of the tied product. Prices for some or all the tied product have been higher than they would be in the competitive market and supply for some or all of the tied product has been lower that it would in an unrestricted competitive market.

181.   Smart and Detail Garage have no legitimate business reason for imposing this tying arrangement, other than to effectuate a monopoly in the market of tied product at the expense of the franchisees.

182.   As a direct and proximate result of the tying arrangement imposed by Smart and Detail Garage, Plaintiffs and Class members have lost sales, profits, and enterprise value of their businesses.  Plaintiffs' and Class members' damages are ongoing and will continue to suffer harm through the loss of trade.

183.   Smart and Detail Garage's tying arrangement unreasonably retrains competition in the tied product market and constitutes a violation of Section 1 of Sherman Act (15 U.S.C. § 1).

**COUNT VI**
**(Against Smart and Detail Garage)**
**Attempted Monopolization**
**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**

184.   Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set forth in full.

185.   The aforesaid actions of Smart and Detail Garage were engaged in with the purpose and intent to injure, suppress, destroy and irreparably harm plaintiffs, and other competitors in the market for the sale of Essential Goods to customers with Detail Garage contracts, in order to control prices and to unlawfully monopolize trade and commerce in this market.

186.   Smart and Detail Garage's actions have created and create a dangerous probability that Smart will succeed in injuring, suppressing, destroying and irreparably harming Plaintiffs and Class members, as well as competitors in the market by achieving a monopoly in the market.

187.   Smart and Detail Garage's actions are not justified by arguments of intent to increase output, enhance the efficiency of, lower prices of or make more competitive these markets or other related markets. These actions in fact injure

competition and consumers, decrease output, raise prices and decrease economic efficiency in said markets. The likelihood of anticompetitive effects from such actions is clear and the possibility of procompetitive effects is remote.

188. Smart and Detail Garage's actions are the direct and proximate cause of Plaintiffs' and Class members' lost sales, profits and value to their businesses. Plaintiffs and Class members will continue to suffer harm through the loss of trade and business and competition to this market will be weakened through the suppression and potential elimination of all competition in this market. Consumers will face elimination of choices causing higher prices for products in this market as well as the decrease of output and efficiency in the market.

189. Smart and Detail Garage's actions constitute an unlawful attempt to monopolize the relevant market Essential Goods for Smart Customers with Detail Garage Contracts; in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, entitling Plaintiffs and the Class members to recover their damages, to the fullest extent provided by law.

**COUNT VII**
**(Against Smart, Detail Garage, Knotek, Schneider, and Zani)**
**Unfair Trade Practices**
**(California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045)**

190. Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 189 to the extent they are consistent with the facts alleged in this cause

of action, with the same force and effect as if said paragraphs were herein set for forth in full.

191. Section 17045 of California's Unfair Practices Act, provides: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

192. Section 17048 also makes it unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, or any agent of any such person, jointly to participate or collude with any other such person in the violation.

193. The discounts, rebates and or other promotional allowances offered by Smart to non-Detail Garage franchisee purchasers of Smart Products were secret and undisclosed to Plaintiffs and Class members. Plaintiffs have been continuously told by Smart personnel that Plaintiffs and Class members are getting the "best price" on the Essential Goods sold by Smart. Upon information and belief, Plaintiffs allege this is not true as Plaintiffs have seen Smart Products advertised

through their eCommerce channels at prices that are not only below MAP but below the price that Smart charges the franchisee for the same products.

194.  Additionally, Smart and Detail Garage, acting in concert, set the minimum prices (MAP pricing) that its distributors and resellers, including the Plaintiffs and Class members as franchisees, can advertise and sell the Smart Products to their customers. However, Smart does not enforce MAP pricing against it and its affiliates, and its other non-franchisee distributors and resellers of Smart Products, all of whom compete with Plaintiffs and other Detail Garage franchisees for customers and sales of Smart Products. Defendants are agents of the entities performing these functions who are each directing, controlling or actively participating in the unlawful conduct.

195.  Plaintiffs are informed and allege that Defendants secretly gave payments, rebates, refunds, commissions, or unearned discounts, services or privileges to certain of Plaintiffs' competitors that were not given to Plaintiffs or other Detail Garage franchisees purchasing on like terms and conditions, including but not limited to:

a.  Selling Smart Products to distributors and resellers at lower prices than received by Detail Garage franchisees;

b.      Exempting distributors and resellers from Smart's minimum advertised price (MAP) policy;

c.      Extending more favorable financing terms and order payment terms for Smart Products;

d.      On information and belief, debt forgiveness,

e.      Priority fulfillment of purchase orders for Smart Products ahead of orders received from Detail Garage franchisees, and

f.      Exempting certain Detail Garage franchisees from executing Franchise Agreements, Inventory Purchase Agreements, Promissory Notes and/or Guarantees.

196.   Plaintiffs allege that Smart also received payments, rebates, refunds, or credits from certain distributers or eCommerce businesses that reduced its costs and increased its profits, and offset the advertised discounted price Smart Products sold on their eCommerce platforms, such as Amazon.com.

197.   Defendants' actions harm Plaintiffs and other Detail Garage franchisees as they deprive Detail Garage franchisees of products which they are required to sell in their stores, negatively impact franchisee sales, increase the franchisees' costs and reduce franchisee operating margins and ultimately cause franchisees to fail.

198.   Defendants' actions tended to destroy competition for and by Plaintiffs and other Detail Garage franchisees.

199.   Defendants' conduct was and is a substantial factor in causing Plaintiffs' and other Detail Garage franchisees' harm.

200.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages, the exact amount and extent of which will be proven at the time of trial, according to proof.

201.   Pursuant to Business and Professions Code Sections 17070 and 17082, Plaintiffs are authorized to recover compensatory and treble damages, plus reasonable attorney's fees together with costs of suit.

202.   Pursuant to Business and Professions Code sections 17070, 17078, and 17079, Plaintiffs also seek to enjoin and restrain Defendants from continuing their violations of Section 17045, including the issuance of one or more orders granting temporary and permanent injunctive relief, and such other restraint as it may deem expedient in order to deter the defendants from, and insure against, their committing a future violation of the Unfair Practices Act.

203.   Business & Professions Code Section 17095 makes any person, who, either as director, officer or agent of any firm or corporation or as agent of any person, violating the provisions of this chapter, assists or aids, directly or indirectly,

in such violation jointly and severally liable with the person, firm or corporation for which he acts.

204.    Defendants Knotek, Schneider and Zani are directors, officers or agents of Detail Garage, Smart and ADS, and/or assisted or aided, directly or indirectly with the violations of the act and are therefore jointly and severally liable for all damage, loss and harm caused to Plaintiffs.

205.    Plaintiffs and other Class members have been damaged by Smart's actions by having their customers purchase Smart products from Smart's eCommerce channels or favored purchasers, and by sustaining lower profit margins and volumes on this existing Smart product sales to end-user consumers.

### COUNT VIII
### (Against Smart, Detail Garage, Knotek and Schneider)
### California Cartwright Act
### (California Business & Professions Code § 16720)

206.    Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 205 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full

207.    California Business & Professions Code Section 16720 prohibits any combination of capital, skill or acts by two or more persons joined or formed for

the purpose of (1) creating or carrying out restrictions in trade or commerce, (2) preventing competition in sale or purchase of merchandise or products, (3) making or entering into or executing or carrying out any contracts, obligations or agreements of any kind or description, by which they (a) agree in any manner to keep the price of any article at a fixed or graduated figure and/or (b) establish or settle the price of any article between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale of any such article .

208.    For purposes of California's Cartwright Act, a contract, combination, or conspiracy that establishes a minimum price below which a retailer, wholesaler, or distributor may not sell a product or service is an unreasonable restraint of trade or commerce and a per se violation of the Cartwright Act.

209.    At all relevant times, Defendants violated California's Cartwright Act by agreeing, combining, conspiring, or colluding with each other to restrain the Detail Garage franchisees' trade and competition by, inter alia, establishing and enforcing minimum pricing restrictions against Detail Garage franchisees, including their compliance with Smart's MAP policy, for their sales of Smart Products and other products required by Detail Garage, while they, either directly

or through their agents and non-franchisee distributors and resellers, advertised, sold, distributed or resold the same Smart Products at less than Smart MAP prices.

210   Defendants, through Smart and Detail Garage, also unlawfully undermined the Detail Garage franchisees' ability to compete by supplying and selling to them the Smart Products and other products required by Detail Garage at prices that were materially higher than the prices they charged the franchisees' competitors.

211.   Defendants, through Smart, Detail Garage, ADS, and AAD, also unlawfully restrained Detail Garage franchisees' trade and competitiveness by manipulating the supply of Smart Products, withholding, partially filling, or delaying the delivery of Smart Products to the franchisees, or by selectively discriminating against the Detail Garage franchisees in the fulfillment of their orders for Smart Products in favor of Defendants, their affiliates, their direct internet sales, and their non-franchisee distributors and resellers.

212.   Defendants' formation of one or more trusts to hinder competition from Detail Garage franchisees through discriminatory pricing, price fixing and limited supplies of Smart Products is contrary to the public policy of the State of California. The foregoing trusts, agreements and/or conspiracy also operated in

such a way as to negate Plaintiffs' freedom and ability to sell the offered Products at prices independently selected by plaintiffs.

213.   The actions of Defendants, and each of them, should be evaluated under the per se rule because the Courts of California have repeatedly held that vertical price fixing is presumed to be unreasonable and therefore unlawful without elaborate inquiry as to the precise harm it has caused or business excuse for its use.

214.   Section 16722 of the Cartwright Act provides: "Any contract or agreement in violation of this chapter is absolutely void and is not enforceable at law or in equity."

215.   Defendants' aforesaid anticompetitive conduct has produced antitrust injury to Detail Garage franchisees and, unless restrained, will continue to injure Plaintiffs and other existing and future Detail Garage franchisees who are or will be unable to compete in the marketplace, and their consumers who have and will continue to pay higher prices through Detail Garage franchise stores.

216.   As a direct and legal result of the unlawful actions of Defendants, Plaintiffs have suffered antitrust injury in that their business has been harmed by means of an unlawful vertical price fixing conspiracy and price discrimination that the antitrust laws were intended to address. Pursuant to Business and Professions Code Sections 16750 and 16761, Plaintiff is authorized to recover compensatory

and treble damages, prejudgment interest at 10% per annum from the date of service of the complaint, reasonable attorney's fees together with costs of suit.

217.   A person has right to have his business protected if there is concert of action directed at him which results in his removal from competition. *Babcock v. Crafts 20 Big Shows, Inc*. (1959) 173 Cal. App. 2d 58, 60.  Pursuant to Business and Professions Code Section 16750(a), Plaintiffs are entitled to temporary and permanent injunctive relief.

218.   Further, Smart, Detail Garage, ADS and AAD are California limited liability companies licensed to do business and engaging in acts and practices that constitute unfair trade practices and violations of the Cartwright Act.  Further, CG Holdings is Delaware limited liability company not licensed to do business in the State of California but, nevertheless since March 2018 has engaging in business in California, including acting as the manager and sole member of Smart, Detail Garage, ADS and AAD.  Pursuant to powers authorized under Section 16750(a), Plaintiffs request affirmative injunctive relief directing the California Attorney General, or a district attorney of Los Angeles County to initiate investigation and revocation proceedings against Smart and CG Holdings to revoke Smart's California registration to do business, and enjoin and prohibit CG Holdings from doing any business in California, as provided by Section 16753.

**COUNT IX**
**(Against Smart, Detail Garage, Knotek, Schneider)**
**Unfair Competition**
**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200)**

219.   Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 218 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

220.   Smart's and Detail Garage's actions violate the federal Robinson-Patman Act, the Sherman Antitrust Act, California Franchise Investment Law, California Franchise Code §22100 (hereafter alleged) and the California Unfair Practices Act §§ 16720 and 17045, and therefore constitute unfair, fraudulent or unlawful conduct within the meaning of the California's unfair competition law.

221.   Business & Professions Code Section 17095 makes any person, who, either as director, officer or agent of any firm or corporation or as agent of any person, violating the provisions of this chapter, assists or aids, directly or indirectly, in such violation jointly and severally liable with the person, firm or corporation for which he acts. Defendants, directly or through their agents, employees, contractors, joint ventures, and co-conspirators engaged in one or more unlawful business practices that harmed Plaintiffs and other Detail Garage franchisees.

222.   Smart and Detail Garage's actions in violation of federal and California antitrust law constitute unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, et seq.

223.   As a result of Smart and Detail Garage's violations of Business and Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of Plaintiffs and the Class members.

224.   To prevent its unjust enrichment and by reason of Smart and Detail Garage's business acts and practices described above, Defendants should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge its illegal gains including but not limited to disgorgement of all revenues, earnings, profits, compensation, and benefits for the purpose of making full restitution. Smart and Detail Garage should also be permanently enjoined from continuing their violations of Business and Professions Code section 17200.

225.   Plaintiffs seek relief for both themselves, for the Class members, and for the general public, and to enforce an important right affecting the public interest, by having a preliminary and/or permanent injunction issued against Defendants.

226.   The relief sought herein, if successful, would confer a significant benefit on the general public.

227.   As a private attorney general seeking to confer an important benefit to the public at large, Plaintiffs seek to recover their reasonable attorneys' fees pursuant to California Civil Procedure Code section 1021.5.

**COUNT X**
**(Against Smart, Detail Garage, Knotek, Schneider and Zani)**
**California Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200 & 10 CCR § 310.114.1)**

228.   Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

229.   The contracts and relationships between Plaintiffs and the Class members on the one hand, and Smart and Detail Garage on the other, associated with the Detail Garage franchise program were entered into in the State of California.   Defendants' actions giving rise to this claim emanated out of California.

230.   California law requires that with a Uniform Franchise Registration Application ("UFRA") the applicant shall include the required information set

forth in California Code of Regulation ("CCR") 310.114.1. CCR 310.114.1 instructs, among other things, that "Salesman Disclosure Form" to be included in the UFRA.

231.   For years 2015, 2016, 2017, 2018, and 2019 Detail Garage has failed file a "Salesman Disclosure Form" for Defendant Chad Zani. Despite, Defendant Zani has illegally sold more than 40 franchise licenses on behalf of Detail Garage.

232.   Detail Garage and Zani's actions were deliberate, intentional and designed to conceal material facts related to Zani from Detail Garage franchise prospects, including Plaintiffs and Class members.

233.   Detail Garage and Zani's actions are in violation of California statutes therefore constitute unlawful and unfair conduct within the meaning of the California's unfair competition law.

234.   Business & Professions Code Section 17095 makes any person, who, either as director, officer or agent of any firm or corporation or as agent of any person, violating the provisions of this chapter, assists or aids, directly or indirectly, in such violation jointly and severally liable with the person, firm or corporation for which he acts. Defendants, directly or through their agents, employees, contractors, joint ventures, and co-conspirators, engaged in one or more unlawful business practices that harmed Plaintiffs and other Detail Garage franchisees.

235.   Smart and Detail Garage's actions which violate California law by misrepresenting or omitting from the franchisor's disclosure of their agents selling Detail Garage franchises constitutes an unlawful, unfair, and fraudulent business act and practice in violation of California Business and Professional Code sections 17200, et seq.

236.   As a result of Smart and Detail Garage's violations of Business and Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of Plaintiffs and other Detail Garage franchisees.

237.   To prevent its unjust enrichment and by reason of Smart and Detail Garage's business acts and practices described above, Defendants should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge its illegal gains including but not limited to disgorgement of all revenues, earnings, profits, compensation, and benefits for the purpose of making full restitution. Smart and Detail Garage should also be permanently enjoined from continuing their violations of Business and Professions Code section 17200.

238.   Plaintiffs seek relief for both themselves, for the Class members, and for the general public, and to enforce an important right affecting the public interest, by having a preliminary and/or permanent injunction issued against Defendants.

239.   The relief sought herein, if successful, would confer a significant benefit on the general public.

240.   As a private attorney general seeking to confer an important benefit to the public at large, Plaintiffs seek to recover their reasonable attorneys' fees pursuant to California Civil Procedure Code section 1021.5.

**COUNT XI**
**(Against Smart, Detail Garage, Knotek, Schneider and Zani)**
**Unfair Competition**
**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
**& Cal. Fin. Code § 22100)**

241.   Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

242.   Under California law, no person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner.

243.   Over the past 2 years, at minimum, Smart and Detail Garage, while acting in concert, have been engaged in the business of a finance lender, which business was promoted and effected by Detail Garage and its agents, including but Defendant Zani.

244. While illegally selling franchise licenses on behalf of Detail Garage, Zani has also offered and effectuated "commercial loans" over $5,000, to Plaintiffs and Class members.

245. Neither Smart, nor Detail Garage, nor Zani are registered finance lenders, within the meaning "finance lender" defined at Cal. Fin. Code § 22009.

246. Smart, Detail Garage and Zani's actions are in violation of California Finance Law, and therefore constitute unlawful and unfair conduct within the meaning of the California's unfair competition law.

247. Business & Professions Code Section 17095 makes any person, who, either as director, officer or agent of any firm or corporation or as agent of any person, violating the provisions of this chapter, assists or aids, directly or indirectly, in such violation jointly and severally liable with the person, firm or corporation for which he acts. Defendants, directly or through their agents, employees, contractors, joint ventures, and co-conspirators, engaged in one or more unlawful business practices that harmed Plaintiffs and other Detail Garage franchisees.

248. Smart and Detail Garage's actions to promote and effect commercial loans without being properly licensed constitutes an unlawful, unfair, and fraudulent business act and practice in violation of California Business and Professional Code sections 17200, et seq.

249.   As a result of Smart and Detail Garage's violations of Business and Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of Plaintiffs and the Class members.

250.   To prevent its unjust enrichment and by reason of Smart and Detail Garage's business acts and practices described above, the court should order Defendants, pursuant to Business and Professions Code sections 17203 and 17204, to disgorge its illegal gains including but not limited to disgorgement of all revenues, earnings, profits, compensation, and benefits for the purpose of making full restitution. Smart and Detail Garage should also be permanently enjoined from continuing their violations of Business and Professions Code section 17200.

251.   Plaintiffs seek relief for both themselves, the Class members, and for the general public, and to enforce an important right affecting the public interest, by having a preliminary and/or permanent injunction issued against Defendants.

252.   The relief sought herein, if successful, would confer a significant benefit on the general public.

253.   As a private attorney general seeking to confer an important benefit to the public at large, Plaintiffs seek to recover their reasonable attorneys' fees pursuant to California Civil Procedure Code section 1021.5.

**COUNT XII**
**(Against Defendants Smart and Detail Garage)**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

254.   Plaintiffs incorporate herein by reference the allegation of paragraphs 1 through133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

255.   California law recognizes that every contract contains an implied covenant of good faith and fair dealing, which imposes on each party to the contract the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, and also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose.  Further, "[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 795). "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372.)

256.   In the alternative, Plaintiffs plead that if the franchise agreements for Detail Garage franchises are valid, then Plaintiffs allege that the Agreements that

Plaintiffs and the Class members are required to sign to become Detail Garage franchisees provide Detail Garage and Smart with discretion as to certain matters associated with or related to the operation and management of the Detail Garage franchise program, and the individual franchise stores.   These items where discretion exists includes but is not limited to:

        a.      Pricing for the Essential Goods charged to the franchisees for the Essential Goods;

        b.      The MAP pricing set by Smart for the Essential Goods / Smart Product;

        c.      Enforcement of MAP pricing;

        d.      Fulfillment of franchisee orders for Essential Goods / Smart Products;

        e.      Shipping charges assessed against the franchisees;

        f.      Promotions and discounted sales for the Essential Goods/ Smart Products;

        g.      Sales of additional franchises within a franchisees' territory;

        h.      Use of National Marketing Funds;

        i.      Remedies upon franchisee default;

        j.      Use of franchisees' customer data;

k.     Unfair competition and encroachment into Plaintiffs markets; and

l.     Restrictions on how Plaintiffs could solicit and sell to customers in their market.

257.   By engaging in the antitrust acts and unfair business practices with respect to Plaintiffs and Class member franchisees, Defendants have breached the implied covenant of good faith and fair dealing.

258.   By interfering with or failing to cooperate with Plaintiffs and the Class members in the performance of the Agreements, Defendants have breached the implied covenant of good faith and fair dealing.

259.   In addition to the facts and allegations set forth above, Defendants also breached the implied covenant of good faith and fair dealing in their franchise contracts with Plaintiffs and other Class members, by:

a.     Imposing minimum approved pricing restrictions on Franchisees;

b.     Defendants allowed themselves to sell the Essential Goods/ Smart Products on their websites and through their eCommerce stores on Amazon.com and eBay.com at below MAP pricing;

c.     Defendants allowed their distributers and third-party resellers to sell the Essential Goods/ Smart Products at below MAP pricing;

d.      Defendants set multiple promotions and discount sales event whereby they discounted the Essential Goods/ Smart Products by up to 50%, which, given that the cost of goods for franchisees is between 40 -60%, virtually ensures that the franchisee will lose money if they participate in the sale by matching prices, or will lose customers to Defendants if they do not;

e.      Defendants used National Marketing Funds for purposes that are inconsistent with the FDD, do not involve or relate to marketing, and/or which only benefit the defendants;

f.      Defendants allowed certain distributers and third part resellers to sell the Essential Goods/ Smart Products below MAP pricing;

g.      Defendants allowed Company stores to sell the Essential Goods through the internet but prohibited franchisees from doing so;

h.      Defendants allowed Company stores to enjoy more favorable inventory payment terms;

i.      In fulfilling customer orders, Defendants used their discretion in favor of their non-franchisee customers and against the franchisees, leaving said franchisees unable to meet their customers' needs and resulting in lost sales and future cash flow;

102

j.     Using customer information generated from Plaintiffs' sales to solicit business for defendants' internet sales channels, including offering online discounts, thereby taking business away from Plaintiffs;

k.     Notwithstanding the representations in the FDDs regarding alternate suppliers, and the massive continual product shortages suffered by Plaintiffs and Class members, Defendants nevertheless refused to approve Plaintiffs' and other

franchisees' requests for use of alternate suppliers and alternate products which could have alleviated their depleted inventory and enabled them to sell goods and improve their financial position;

260.   Defendants knew or should have known that their actions, and their exercise of discretion in matters affecting Plaintiffs and Class members was unfair, fraudulent or unlawful, and their conduct was objectively unreasonable. Defendants further abused their discretionary powers by inserting into the franchise agreements void and unenforceable provisions that were unlawful, designed to exculpate defendants and their affiliates from their own misconduct in violation of California Civil Code § 1668. Defendants 'exercise of discretion was not in good faith nor in accordance with fair dealing.

261.   As a direct and proximate result of Defendants' breaches, Plaintiffs have been damaged, in excess of the jurisdictional limit, the exact amount of which will be proven at the time of trial, according to proof.

**COUNT XIII**
**(Against Smart, Knotek, Schneider and Zani)**
**Negligent Interference with Economic Advantage**

262.   Plaintiffs incorporate herein by reference paragraphs 1 through 261 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

263.   In the alternative, Plaintiffs plead that if the franchise agreements for Detail Garage franchises are valid, then Plaintiffs alleges that Defendants knew that Plaintiffs and the Class members had or have a prospective business relationship with their existing and future customers for Detail Garage / Smart Products that was advantageous to Plaintiffs and the Class members.

264.   Defendants, as the franchisor, manufacturer/supplier/distributor, and/or internet sales manager/ product fulfillment agent for the Essential Goods/Smart Products, owed to Plaintiffs and the Class members a duty of care to ensure that their franchise business was not impaired, hindered or prejudiced by Defendants' business activities and practices, or would be subjected to any unlawful, fraudulent or unfair business acts or practices in the solicitation, offer or

sale of the Detail Garage franchises, or thereafter in their activities as franchisees, including anticompetitive practices in violation of law.

265    Defendants further owed a special duty of care to Plaintiffs and the Class members because Defendants thoroughly controlled the manufacture, distribution and sale of the Essential Goods/ Smart Products.

266. Plaintiffs' and the Class members' success as Detail Garage franchisees was dependent upon their being competitive in the marketplace, adherence to and enforcement of Smart's MAP pricing, Defendants' ability to manufacture and timely deliver ordered product to the franchisees, and a reasonable cost charged by Defendants to Plaintiffs and the Class members for the Essential Goods.

267.   By engaging in the unfair, unlawful and fraudulent acts set forth in this complaint, Defendants have breached their duty of care to Plaintiffs and the Class members and have harmed Plaintiffs and the Class member and their respective franchise businesses.

268.   The adverse effect of Defendants' misconduct or breaches of duty on Plaintiffs' and Class members' franchise businesses and personal liability were clearly foreseeable.

269.   As a direct and proximate result of Defendants' actions which breached their duty to Plaintiffs and the Class members, they have suffered injury, loss or harm from defendants' actions in excess of this court's jurisdiction, the exact scope and amount of which will be proven at the time of trial, according to proof.

**COUNT IX**
**(Against Smart, ADS, Knotek, Schneider and Zani)**
**Intentional Interference with Existing Contractual Relations Economic Advantage**

270.   Plaintiffs incorporate herein by reference paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

271.   In the alternative, Plaintiffs plead that if the franchise agreements for Detail Garage franchises are valid, then Plaintiffs alleges that Defendants intentionally interfered with their contractual relationship with Detail Garage for the purpose of causing Plaintiffs' default and loss of their franchise stores.

272.   Defendants knew that Detail Garage's Franchise Agreement required Plaintiffs and the other franchisees to purchase from Smart the Essential Goods they sold in their franchise store, and to be successful franchisees they had to be able to sell their products at competitive prices and have sufficient inventory of product at their stores.  Defendants further knew that Plaintiffs' ability to meet their

106

operating expenses, including payment for their initial inventory loan, and current and future inventory orders, was dependent upon Plaintiffs' ability to sell significant quantities of the Essential Goods at a profit.

273.   Notwithstanding this knowledge, defendants engaged in intentional acts that were intended to or that defendants knew would likely impede Plaintiffs' sales of Essential Goods, including imposition of minimum MAP pricing, failure to enforce MAP pricing against non-franchisees, inventory shortages, frequent promotions and sales and deep discounted, below MAP pricing of Smart Products on Defendants' websites and eCommerce stores, and imposition of policies that prohibited franchisees' participation in special promotions and events that generated additional sales.

274.   Defendants knew or should have known that their actions would harm Plaintiffs and other franchisees and cause them to default on their Franchise Agreements with Detail Garage, with the potential loss of their franchise.

275.   Defendants' wrongful actions of price fixing, sales price restrictions, and discriminatory fulfillment of product orders prevented Plaintiffs from meeting sales minimums set by Detail Garage, created cash flow issues for franchisees, resulted in reduced product due to lack of inventory, and negatively impacted their ability to pay for product orders or repay their initial inventory loan per the terms

of the promissory notes, and resulted in Defendants' denial of Plaintiff Big Apple's requests for approval for two additional franchise stores and denial of the benefits of the ADA. Defendants' wrongful actions have also caused Plaintiffs to default on the franchise agreements, and triggered the issuance and service of Notices of Default which, if not cured, will result in the termination of Plaintiffs' Detail Garage franchises, with possible personal liability on the individuals:

276. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages, the exact amount of which will be proven at the time of trial according to proof.

277. Defendants' actions were and are oppressive, malicious, and despicable, and warrant the imposition of punitive damages under Civil Code Section 3294 against Defendants, in an amount to be determined at the time of trial, according to proof at trial.

**COUNT XV**
**(Against Detail Garage)**
**Validity of the Arbitration Agreements**
**(Declaratory Judgment, 28 U.S.C. § 2201)**

278. Plaintiffs incorporate herein by reference paragraphs 1 through 133 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

279.   An actual controversy has arisen between Plaintiffs and the Class members and Defendants Detail Garage regarding the validity of the arbitration agreement contained in the Franchise Agreement and Guaranty, and Indemnification Agreement (Exhibit 4), Area Development Agreement and Exhibit C (Guaranty and Assumption of Obligations) entered into between Plaintiffs and Detail Garage.

280.   Plaintiffs allege for themselves and the Class members that Smart and Detail Garage had overwhelming bargaining power over Plaintiffs with respect to the franchise transactions, that Smart and Detail Garage drafted the Franchise Agreements and all exhibits (including Exhibit 4: Guarantee, Indemnification And Acknowledgement), the Area Development Agreement and Exhibit C (Guaranty and Assumption of Obligations), and the Inventory Purchase Agreements and Secured Promissory Notes used in connection with the sale of Detail Garage franchises and financing of initial inventory purchases, and that each these agreements were presented to Plaintiffs and the Class members by Detail Garage and Smart on non-negotiable, a take-it-or-leave-it basis. The arbitration agreements are contained in the Franchise Agreements and Guarantees, and Area Development Agreement which are contracts of adhesion.

281. These arbitration agreements in the Franchise Agreements and Guarantees, and the Area Development Agreement and Exhibit C are further unconscionable as they require Plaintiffs and the Class members to arbitrate their controversies against Detail Garage but allow franchisor Detail Garage to litigate its claims in court against Plaintiff and the Class member guarantors arising from the Franchise Agreement and Guarantees and Area Development Agreement and Exhibit C, regardless of how intertwined the claims and defenses are. Hence the arbitration agreements lack mutuality and are burdensome and oppressive to Plaintiffs and the Class members. Additionally, the arbitration agreements in the Franchise Agreement and the Guarantee at Exhibit 4 and the Area Development Agreement and Exhibit C are vague and ambiguous as they contain conflicting arbitration agreements and, therefore, there is no meeting of the minds as to arbitration or its terms.

282. Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 for themselves and the Class members that: 1) this court has jurisdiction to determine the validity of the arbitration agreements and 2) the arbitration agreements are vague, ambiguous oppressive, and unconscionable and unenforceable as a matter of law.

**COUNT XVI**
**(Against Detail Garage and Smart)**
**Validity of the Franchise Agreements and Area Development Agreement**
**(Declaratory Judgment, 28 U.S.C. § 2201)**

283.   Plaintiffs incorporate herein by reference paragraphs 1 through 153 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

284.   An actual controversy has arisen between Plaintiffs and the Class members and Defendants Detail Garage and Smart regarding the enforceability of the Franchise Agreements.   Plaintiffs contend for themselves and the Class members that the documents and forms that Defendants filed between 2015 and 2019 to register Detail Garage's franchise offering, and to renew Detail Garage's franchise offering, contain information that is false or misleading, or omitted material facts that were needed to make the representations made not misleading. Plaintiffs also contend that the FDDs provided to one or more prospective franchisees between 2015 and 2019 contain one or more misrepresentations of material facts and/or omitted one or more material facts that were necessary to be disclosed to make said FDDs not misleading.   Plaintiffs further allege that Defendants presented the pre-prepared Franchise Agreement documents to Plaintiffs and the Class members as non-negotiable, i.e., on a take it or leave it basis, and that Defendants had the bargaining power and they had none.

285. Plaintiffs assert that Defendants fraudulently induced Plaintiffs and the Class members to purchase the Detail Garage franchises and to finance their initial inventory order with Smart. Plaintiffs further assert that because the Franchise Agreements and associated Inventory Purchase Agreement and Secured Promissory Notes were induced by fraud, they are null and void ab initio, and unenforceable as against Plaintiffs and the Class members as a matter of law. Plaintiffs further assert that as these Defendants engaged in unfair, fraudulent or unlawful business practices and anticompetitive practices against Plaintiffs and the Class members in violation of California and federal antitrust law, that Plaintiffs and the Class members are entitled to rescind these agreements, and Defendants' actions and decisions which have damaged Plaintiffs and the Class members, or which have or seek to terminate Plaintiffs' and the Class members' franchises are null and void.

286. Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that: 1) Plaintiffs' and the Class members' purchases of Detail Garage franchises and financing of inventory orders were induced by Defendants' fraud or involved a franchise offering which violated California Franchise Investment Law §§ 31200 and 31201, 2) the Franchise Agreements and associated Inventory Purchase Agreements and Secured Promissory Notes were the fraudulently induced, and

therefore are void and unenforceable, 3) Plaintiffs and the Class members are entitled to rescind the Franchise Agreements; 4) any action by Detail Garage to terminate Plaintiffs' and the Class members' Franchise Agreements for any reason is a breach by Detail Garage of the Franchise Agreements; 5) Plaintiffs and the Class members are franchisees in good standing under the Franchise Agreements; and 6) Plaintiffs and the Class members are entitled to, and shall, receive from Detail Garage and Smart all rights, privileges and benefits afforded by and/or appurtenant to the Franchise Agreements.

**COUNT XVII**
**(Against Smart)**
**Validity of the Inventory Purchase Agreement and Secured Promissory Note**
**(Declaratory Judgment, 28 U.S.C. § 2201)**

287.   Plaintiffs incorporate herein by reference paragraphs 1 through 133, and 241 - 253 to the extent they are consistent with the facts alleged in this cause of action, with the same force and effect as if said paragraphs were herein set for forth in full.

288.   A controversy has arisen between Plaintiffs and the Class members and Defendant Smart regarding the validity of the Inventory Purchase Agreement and Secured Promissory Note.

289.   Defendants Smart and Detail Garage s assert that a franchisees' late payment of Smart invoices is a breach of the Franchise Agreement, Guarantee Agreement and the Inventory Purchase Agreement and Secured Promissory Notes and have threatened to take legal action against Plaintiffs.  Plaintiffs assert for themselves and the Class members that because neither Detail Garage nor Smart are licensed finance lenders as required by Finance Code § 22100, that the Inventory Purchase Agreement and Secured Promissory Notes are unlawful and are null and void ab initio and unenforceable against Plaintiffs and the Class members as a matter of law.

290.   Pursuant to the Federal Declaratory Judgment Act, 28 USC § 2201, Plaintiffs seeks a judicial determination for themselves and the Class members that: 1) the ability to finance the initial inventory purchase of Essential Goods with Smart is a material and integral component of the Detail Garage franchise program; 2) that Smart and Detail Garage engaged in the business of a finance lender when financing the Detail Garage franchisees' initial inventory orders for Essential Goods; 3) neither Detail Garage nor Smart are licensed finance lenders, 4) the Inventory Purchase Agreements and Secured Promissory Notes are null and void and unenforceable as a matter of law, and 5) any action by Detail Garage or Smart to terminate Plaintiffs or the Class members' Franchises under the Franchise

Agreements for nonpayment or late payment of smart invoices, or to take any action against Plaintiffs' or the Class members' collateral under the agreements, is a breach of the Franchise Agreement and the associated Inventory Purchase Agreement and Secured Promissory Note.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) An Order certifying the proposed Class herein and appointing Plaintiffs and the undersigned counsel of record to represent the Class;

(b) An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint, and for a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(c) An Order Declaring the following: 1) that the arbitration agreements set forth in the Agreements between Plaintiffs and Class members with Detail Garage and Smart are null and void and unenforceable as a matter of law; 2) that the Detail Garage franchise offering violated the California Franchise Investment Law, Cal. Corp. Code §§ 31200 and 31201, and 3) the Agreements between Plaintiffs and Class members with Detail Garage and Smart concerning, related to or arising out

of the purchase of Detail Garage franchises and financing of inventory sold by Smart are null and void and unenforceable as a matter of law;

(d)     An Order that Defendants, and all agents, servants, employees, officers, directors, attorneys, partners, partnerships and representatives under the control and supervision thereof, are preliminarily and permanently enjoined from (a) terminating Plaintiffs' Franchise Agreements for the Franchise Stores; (b) reentering and assuming operations of Plaintiffs' Franchise Store locations; (c) denying Plaintiffs the right to use the Defendants' proprietary marks, methods, systems and techniques associated with Detail Garage's "System" as granted under the applicable Franchise Agreements; (d) denying Plaintiffs the right to order, purchase and sell Defendants' products, without restriction or limitation, in accordance with and subject to only the terms of the Franchise Agreements; and (e) denying or interfering with Plaintiffs' right and opportunity to sell the Franchise Store locations to the highest bidder in accordance with and subject to the terms of the Franchise Agreements, and to receive full equity from the sale of their business;

(e)     For a Declaration that Detail Garage's sales of franchises to Plaintiffs and the Class members violate California Franchise Investment Law, Corporations Code Sections 31200 and/or 31201 and the Agreements between Plaintiffs and Detail Garage and/or Smart are void and unenforceable as a matter of law;

(f)     For a Declaration that the Franchise Agreements, as engaged in, enforced, carried out and applied by Defendants in the manner set forth above, unreasonably restrain trade and are illegal under §§ 33200 and 33201 of the California Franchise Investment Law, §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 1, the Robinson Patman Act, 15 U.S.C. §13(a), the California Finance Act § 22100, the California Cartwright Act, Bus. & Prof. Code § 17020, and California Unfair Practices Act § 17045, and § 17200;

(g)     That with regard to the First and Second Causes of Action, it be adjudged that Defendants violated California Franchise Investment Law, Cal. Corp. Code §§ 31200 and 31201, and that Plaintiffs are permitted to rescind their Detail Garage franchise agreements and affiliated agreements with Smart, receive restitution and disgorgement of profits, and that their violations were willful entitling Plaintiffs to recover their damages, statutory interest and their attorneys' fees and costs;

(h)     That with regard to the Third Cause of Action, it adjudged that Defendants have engaged price discrimination for and with the purpose of eliminating Plaintiffs and other Detail Garage franchisees from competition in violation of 15 U.S.C. §13(a) and that Plaintiffs be awarded, pursuant to 15 U.S.C. §15(a), including rescission, restitution, treble the amount of actual damages,

interest, reasonable attorneys' fees and costs of the suit, and all other available damages whether punitive, exemplary or otherwise;

(i)     That with regard to the Fourth, Fifth, and Sixth Causes of Action, it adjudged that Defendants have engaged and actively participated in an unlawful trust, combination, conspiracy and/or agreement to restrain trade by engaging in unlawful price discrimination and minimum pricing constraints, and in tying products in violation of 15 U.S.C. §1 and California Bus. & Prof. Code § 17045, and attempted monopolization in violation of 15 U.S.C. § 2, and that Plaintiffs be awarded, pursuant to 15 U.S.C. §15(a), including rescission, restitution, treble the amount of actual damages, interest, reasonable attorneys' fees and costs of the suit, and all other available damages whether punitive, exemplary or otherwise;

(j)     That with regard to the Seventh Cause of Action, it be adjudged that Defendants have engaged and actively participated in an unlawful trust, combination, conspiracy and/or agreement in violation of California Business and Professions Code section 17045, and that Plaintiff be awarded, pursuant to California Business and Professions Code section 17070 and 17082, including rescission, restitution, treble the amount of actual damages, interest, reasonable attorneys' fees and costs of the suit;

(k)     That with regard to the Eighth Cause of Action, it be adjudged that Defendants have engaged and actively participated in an unlawful trust, combination, conspiracy and/or agreement in violation of California Business and Professions Code section 16720, and that Plaintiff be awarded, pursuant to California Business and Professions Code section 16750, including rescission, restitution, treble the amount of actual damages, interest, reasonable attorneys' fees and costs of the suit;

(l)     That with regard to the Ninth and Tenth Causes of Action, it be adjudged that Defendants' have engaged in unfair, fraudulent or unlawful business practices in violation of California Business and Professions Code section 17200, and that Plaintiffs shall be awarded all remedies available under California Business and Professions Code Section 17203, including rescission, restitution, and disgorgement of profits.  Further, that the Court, pursuant to Civil Code Section 1021.5, award to Plaintiffs their reasonable attorney's fees, expert witness fees, and costs of suit;

(m)     For an order enjoining Defendants' conduct and declaring and adjudging that such conduct is unlawful and in violation of the federal antitrust law and California antirust and unfair competition law, and that Plaintiff was injured in its business as a result of Defendant's violations;

(n)     As to all causes of action:

119

(i) For rescission and restitution where appropriate and provided for by statute;

(ii) For an award of compensatory, special, consequential damages according to proof;

(iii) For an award of statutory, treble and punitive damages according to proof;

(iv) For an award of pre-judgment interest; and

(v) For any other and further relief that the Court may deem just and proper.

Dated: January 20, 2020          Respectfully submitted,

_____
LESLIE SCHWAEBE AKINS (SBN 138678)
LESLIE SCHWAEBE AKINS, A Law Corporation
7157 Argonauta Way
Carlsbad, California 92009
Telephone:    (760) 931-2920
Facsimile:    (760) 603-0547
E-Mail: lsa@stockmarketlaw.com
Attorney for Plaintiffs

120

1

JURY DEMAND

2

3       Plaintiffs hereby demand a trial by jury pursuant to Rule 38, Federal Rules

4  of Civil Procedure.

5  Dated: January 20, 2020          Respectfully submitted,

6

7

8

9

10                                  LESLIE SCHWAEBE AKINS (SBN 138678)
                                    LESLIE SCHWAEBE AKINS, A Law Corporation
11                                  7157 Argonauta Way
                                    Carlsbad, California 92009
12                                  Telephone:    (760) 931-2920
                                    Facsimile:    (760) 603-0547
13                                  E-Mail: *lsa@stockmarketlaw.com*
                                    Attorney for Plaintiffs
14

15

16

17

18

19

20

21

22

23

24

25